63 U.S. 56
 22 How. 56
 16 L.Ed. 256
 SPRINGFIELD TOWNSHIP, OF FRANKLIN COUNTY,
PLAINTIFF IN ERROR,
v.
JOHN H. QUICK, AUDITOR, AND WILLIAM ROBESON, TREASURER,
OF FRANKLIN COUNTY.
 December Term, 1859
 
 1
 THIS case was brought up from the Supreme Court of the State of Indiana by a writ of error, issued under the twenty-fifth section of the judiciary act.
 
 
 2
 It originated in the county of Franklin, before the judge of the fourth judicial circuit of the State of Indiana, and was called a civil action. Springfield township filed a complaint against Quick, the auditor, and Robeson, the treasurer, of Franklin county, alleging that they had in their hands a certain sum of money, which they were about to distribute erroneously, and praying for an injunction to prohibit them from making the distribution in the mode which they proposed.
 
 
 3
 On the 21st of May, 1855, an injunction was issued by the clerk of the court, according to the prayer of the bill. In August, 1855, the defendants demurred to the bill, upon the ground that the complaint did not state facts sufficient to constitute a cause of action. The court overruled the demurrer, and ordered the defendants to answer; which being declined, the injunction was made perpetual. The defendants appealed to the Supreme Court, which reversed the judgment, and Springfield township brought the case up to this court.
 
 
 4
 The reservation by Congress of the sixteenth section of the public lands in each township in all the new States, and its appropriation to school purposes for the benefit of the inhabitants of the township, is so well known to all readers of American history, that a brief reference to the legislation of Indiana will be sufficient to explain the point involved in the present case.
 
 
 5
 Under the authority of an act of Congress, Springfield township sold the sixteenth section, in 1836, for the sum of $7,423.36; which was invested, and the interest applied to the support of schools within the township. It was conceded, in the argument of this case, that the township was still entitled to the use of this money, and to receive it; but the claim was for an additional amount, from a fund which accrued under the State laws of Indiana.
 
 
 6
 In 1851, Indiana adopted a new Constitution, the eighth article of which established a school fund, derived from several sources, which were directed to be consolidated into one fund. The first of these sources was the Congressional township fund and the lands belonging thereto. Then followed an enumeration of ten different sources from which revenue was derived, all of which were united into one common fund. This was directed, by an act of the Legislature, to be apportioned amongst the several counties of the State, according to the enumeration of scholars therein, without taking into consideration the Congressional township fund in such distribution.
 
 
 7
 But the Constitution also contained the following section, being section seven, in the eighth article, viz:
 
 
 8
 'All trust funds held by the State shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created.'
 
 
 9
 It is evident that, under this act of the Legislature, Springfield township might have received less than the interest of the sum for which section sixteen had been sold, the proceeds of which had been invested. Therefore a suit was brought against the auditor, treasurer, and board of commissioners, of Franklin county, to test the constitutionality of the law; and at November term, 1854, the Supreme Court of the State decided that the act of the Legislature was a violation of the seventh section of the eighth article of the Constitution just quoted, and was consequently null and void. The case is reported in 6 Indiana Reports, page 84.
 
 
 10
 In March, 1855, the Legislature passed another act, providing for the distribution of the fund, but inserting the following proviso at the end of the one hundred and first section:
 
 
 11
 'Provided, however, that in no case shall the Congressional township fund, & c., be diminished by such distribution, and diverted to any other township.'
 
 
 12
 Springfield township filed the complaint now in question, alleging that they were entitled to $435.17, being the interest of the sum for which section sixteen had been sold, and also to $437.76, being its distributive share, making in the aggregate $872.93, to be distributed in said Springfield township; or, in other words, that the State had no right to charge them, in estimating their distributive share, with what they had received under the Congressional township fund.
 
 
 13
 The history of this suit has been given in the early part of this statement, by which it will be seen that the Supreme Court of Indiana decided against the claim of Springfield township. The case is reported in 7 Indiana Reports, page 636.
 
 
 14
 It was submitted on printed argument by Mr. Barbour for the plaintiff in error, and Mr. Jones for the defendant.
 
 
 15
 Mr. Barbour enumerated the acts of Congress which bore upon the case, and also the Constitution and laws of Indiana. The point which he made resulted from this examination, and was stated in the following manner:
 
 
 16
 The eighth article of that Constitution contains the following provisions on the subject of education:
 
 
 17
 'SEC. 1. Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government, it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide by law for a general uniform system of common schools, wherein tuition shall be without charge, and equally open to all.
 
 
 18
 'SEC. 2. The common school fund shall consist of the Congressional township fund, and the lands belonging thereto, the surplus revenue fund, and the other funds named.'
 
 
 19
 The third, fourth, and fifth sections provide for the funding, investment, and distribution thereof.
 
 
 20
 Sec. 6 makes the several counties liable for the preservation of the fund, and payment of the interest thereon.
 
 
 21
 'SEC. 7. All trust funds, held by the State, shall remain inviolate, and be faithfully applied to the purposes for which the trust was created.'Sec. 8 provides for the election of a State superintendent of public instruction.
 
 
 22
 Pursuant to the provisions of this article of the Constitution, the first Indiana Legislature convened after its adoption, by an act approved June 14, 1852, and found in the Revised Code of 1852, (vol. 1, page 439,) undertook to consolidate the school funds of 1852, and to distribute generally over the State the proceeds of the sixteenth section in each township, reserved by Congress to the inhabitants of the respective townships in which the sections are situate, for the use of schools therein.
 
 
 23
 This distribution was controverted by the present plaintiffs in the State courts, and their power and right to the exclusive control of this sixteenth section and its proceeds fully established by the Supreme Court of the State of Indiana, in the case of the State of Indiana and others v. Springfield Township, reported in 6 Indiana Reports, page 84, &c., and which is especially referred to the attention of this court, as containing a true statement and history of the legislation of Indiana on this subject, and a full vindication of the right of the plaintiffs in this case to the relief sought.
 
 
 24
 Shortly after this judgment was pronounced by the Supreme Court of the State of Indiana, which was at the November term, 1854, the Legislature of Indiana, to avoid its force and effect, and indirectly to accomplish that which the court determined could not be done, passed an act, approved March 5, 1855, entitled 'An act to provide for a general system of common schools, the officers thereof, and their respective duties, and matters properly connected therewith, and to establish township libraries, and for the regulation thereof.'
 
 
 25
 See Acts of Indiana for 1855, page 161.
 
 
 26
 The following is the ninety-seventh section of that act:
 
 
 27
 'The State superintendent shall annually, by the fourth Monday in April in each year, make out a statement showing the number of scholars in each county of the State, the amount of the income of the common school fund in each county for distribution, and the amount of taxes collected for school purposes, and shall apportion the same to the several counties of the State, according to the enumeration of scholars therein, without taking into consideration the Congressional township funds in such distribution.'
 
 
 28
 After having in this manner furnished the basis for the distribution of the income of the common school fund and amount of the school tax for the current year amongst the several counties, the act prescribes, in its 101st section, the method of distributing, in each county, the sum so apportioned to it. It is as follows:
 
 
 29
 'The treasurer of the several counties shall annually, on the third Monday of May, make distribution of the income of the common school fund to which his county is entitled (upon the warrant of the county auditor) to the several townships and incorporated cities and towns of the county, which payment shall be made to the treasurer of each township; and in making the said distribution, the auditor shall ascertain the amount of the Congressional township fund belonging to each city, town, and township, and shall so apportion the income of the common school fund as to equalize the amount of available funds in each city, town, and township, as near as may be, according to the number of scholars therein: Provided, however, That in no case shall the Congressional township fund be diminished by such distribution, and diverted to any other township.'
 
 
 30
 To controvert the right of distribution under these sections, the plaintiffs in error filed their complaints in the court below. Issue was joined, and the cases went to the Supreme Court of the State of Indiana, where the judgment was finally against the plaintiffs in error, and to reverse which, these writs of error are prosecuted under the act of Congress.
 
 
 31
 The plaintiffs in error insist that the eighth article of the Constitution of 1851 of the State of Indiana, and the legislation of said statute of March 4, 1855, above referred to, are both in violation of the ordinance and acts of Congress, vesting these said sixteenth sections in the inhabitants of the respective townships in which they are situated, and consequently void.
 
 
 32
 It cannot be disguised that this legislation of 1855 was a palpable evasion of the judgment pronounced by the Supreme Court of Indiana, in 6 Indiana Reports, page 84. And this high court will certainly not tolerate this petty subterfuge, but will hold as they did in Trustees for Vincennes University v. the State of Indiana, (14 Howard's Supreme Court Reports, page 268,) that the rights of parties cannot thus be trifled with, but will be held sacred from all improper legislation.
 
 
 33
 The judgment of the Supreme Court of Indiana in the case at bar, (7 Indiana Reports, page 636,) pronounced by Judge Gookins, we think is a very lame attempt to justify the eighth article of the Constitution of 1851 and the act of 1855, and cannot be sustained by reason or authority. With all due respect for the opinion of that court, it is a mere ad captandum argument, and, as will be seen, was the opinion of a divided court.
 
 
 34
 What rights are saored which can be spirited away in this manner, or what respect can such legislation or judicial construction command, when it is conceded that the same effect is produced indirectly, which, it is solemnly pronounced, cannot be done directly.
 
 
 35
 The plaintiffs in error appeal to this honorable court to protect their rights and interests, vested under these acts of Congress, against this unjust State legislation, and against this void provision of the State Constitution.
 
 
 36
 The rights of the plaintiffs in error appear to them so plain and self-evident, that it is difficult to frame an argument to support them, and they are submitted to the court on their own intrinsic merits.
 
 Mr. Jones made the two following points:
 
 37
 1. Is the act in question constitutional?
 
 
 38
 2. Does it violate the act of Congress making the grant of the sixteenth section of lands in the several Congressional townships of the State of Indiana, 'to the inhabitants thereof, for the use of schools?'
 
 
 39
 In arriving at the merits of this case, it may not be improper to view it with reference to a general question, as to whether it is in contravention of any provision of the Constitution of the United States. The appellees insist it is not, as that instrument is but a charter of privileges and powers ceded and delegated by the people of the Union to the General Government, as restrictions and concessions of inherent sovereignty, necessary to be made in order to create, give efficiency to, and perpetuate, a parent government. And that the right exercised by the State of Indiana, as claimed by her in the law in question, is not a ceded nor a delegated right, and that its exercise is not, by reasonable construction, within any prohibitive feature of the Federal Constitution. On the contrary, this right is conceived to be within the reasonable limits of the rights specially reserved to the States or to the people—the true source of all political power by the tenth amendment to that instrument, that 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people.'
 
 
 40
 Does it contravene any provision of the Constitution of the State of Indiana? It is insisted that it does not, as the Constitution of the State is but an organic rule, originating in and restrictive of the unlimited powers of a sovereignty. Not defining what alone the Legislature may do, in its capacity as the law-making power of the State, but positively prohibiting certain acts of legislation; denying that branch of the State Government the privilege of interfering with certain defined rights, reserved by the people, and pointing out the mode in which legislation shall be conducted. It does not withhold from the State the right to prescribe, through the agency of her Legislature, a rule for the taxation of her people and their property, within her limits, for educational purposes. Nor does it prohibit any distribution the Legislature may see proper to direct of such taxes so collected, whether that distribution be per capita, or with reference to existing educational advantages one locality may have over another; and whether donations from the General Government, or other sources, shall be taken into consideration in the mode of distribution, is conceived to be an untrammelled power of the Legislature of the State, the exercise of which is unforbidden by any provision of either the State or the Federal Constitution.
 
 
 41
 The very features of the law complained of are component parts of the State Constitution; and, if not repugnant to other subsequent provisions of that instrument, their validity is coequal with the Constitution itself. These provisions are contained in the eighth article of the Constitution of the State.
 
 
 42
 Vide R. S. of Ind., 1852, vol. 1, page 62.
 
 
 43
 The sections of the law held to be exceptionable by the appellant are clearly within the directory provisions of the eighth article of the Constitution of Indiana; and section one eighth article of the Constitution of Indiana; and section one hundred and one, so far from diverting or diminishing the Congressional township fund, expressly provides, 'that in no case shall the income of the Congressional township fund belonging to any township, or part of such township, be diminished by such distribution, and diverted to any other township.'
 
 
 44
 Laws of the State of Indiana, 1855, page 176.
 
 
 45
 It is insisted by the appellant that the act is contraventive of that provision of the State Constitution which requires all laws of the State to be of uniform operation throughout the State, which position the appellees deem to have been properly held untenable by the Supreme Court of the State in this same case. That court says: 'It does not conflict with the twenty-third section of the fourth article, (of the Constitution of the State of Indiana,) which requires all laws to be of uniform operation throughout the State, for the act is not only uniform in itself, but it produces uniformity in the subjects upon which it operates.'
 
 
 46
 It is submitted, whether the same rule of construction which applies to a statute does not apply to a Constitution. That where the proviso of an act (or Constitution) is directly repugnant to the purview of it, the proviso will not stand as speaking the last intention of the maker. Or, in other words, is not the subsequent constitutional provision of the eighth article of the Constitution of the State of Indiana an exception to the prohibition of the fourth article of that instrument?
 
 
 47
 Nor can it be brought within the prohibitions enumerated in the twenty-second section of the fourth article of the State Constitution, as the only mention there made of the subject as a restriction of the State, forbidding the passage of local or special laws 'providing for supporting common schools, and for the preservation of the school fund'—the law itself being made to operate generally and uniformly throughout the entire State.
 
 
 48
 It is an unquestioned duty of the State to preserve, in good faith, the trust funds held by her for the benefit of her citizens. In the same article of her Constitution containing the educational provisions, which the act in question was framed to carry into effective practice, she solemnly acknowledges that obligation by providing that 'All trust funds held by the State shall remain inviolate, and be faithfully and exclusively applied to the purposes for which the trust was created.' And the appellees insist that it is not inconsistent with her good faith in that respect for her, in the untrammelled exercise of State sovereignty, in making provisions for the education of her people, to take into consideration these donations made for educational purposes, and to so distribute all other funds as to equalize the educational facilities of the whole State.
 
 
 49
 The entire subject matter upon which the act in question proposes to operate is within the limits of the State of Indiana. She does not propose, by this legislative enactment, to assume control of any foreign matter whatever. And it has been held, 'That a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits as any foreign nation, when that jurisdiction is not surrendered or restrained by the Constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty, of a State to advance the safety, happiness, and prosperity, of its people, and to provide for its general welfare by any and every act of legislation which it may deem to be conducive to these ends, when the power over the particular subject, or the manner of its exercise, is not surrendered or restrained in the manner just stated. That all those powers which relate to merely municipal legislation, or which may more properly be called internal police, are not surrendered or restrained; and consequently, in relation to them, the authority of a State is complete, unqualified, and exclusive.'
 
 
 50
 Mayor, Aldermen, and Commonalty of City of New York v. George Miln, 11 Peters, 102.
 
 
 51
 Inasmuch as the act does not propose to divert the Congressional township fund, but expressly provides against its diversion and diminution, and for its faithful preservation and application to the specified use for which it was granted, it most certainly does not violate the act of Congress granting the lands to the several townships of the State. Such construction can only be given to the act in question, by imputing to the State Legislature an ignorance or duplicity inconsistent with common intelligence and common honesty.
 
 
 52
 It being unquestionably the duty of all Christian legislators to exercise, in sound discretion, those attributes of sovereignty called into requisition in providing means for the cultivation of the intelligence and morality of the people, it is insisted that the widest scope of power is vested in the Legislature of the State of Indiana, to provide means for the education of the masses within her limits. If it be not competent for her Legislature to take into consideration advantages already enjoyed by favored sections of the State, and a sufficient tax were levied to insure a competent school fund in all parts of the State, on a basis of uniform taxation, the consequence would be, that in wealthy localities, with but few proper subjects to receive the intended benefit, an unnecessary tax would have to be levied and collected, and an unemployed surplus hoarded up, to become a bone of contention, and an inducement to legislative folly and extravagance, as all past history has ever proven plethoric treasuries to have been, as well as a monument of a want of that proper appreciation of sovereignty which would deny discretionary power, in a sovereign State, to equalize and render uniform the operation of her laws, and the benefits to her people arising therefrom, by exercising inherent powers consistent with the public welfare, and not prohibited by any higher law.
 
 
 53
 It being a well-settled principle that the power of a State to levy taxes, to create a revenue for any specified object, is an incident of sovereignty, and only restricted by constitutional inhibitions; and there being no such constitutional prohibition the sense of honor, justice, and equity, of a State alone defining the limits within which that power shall be exercised—what feature of the law in question can be said to exceed the authority of the State? In the Constitution of the State of Indiana, there is no feature, the appellees insist, prohibiting the levying and collecting of taxes such as contemplated by the school law in question. And that a necessary incident to the power to create a revenue is the power to disburse it; to apply it to the wants of the community in which it was raised. The Constitution of the State being silent as to the mode of distributing the common school fund, that burden was necessarily cast upon the Legislature. In the exercise of this necessary, incidental power, that body directs that all the funds raised, to constitute a common school revenue, be so distributed, taking into consideration the Congressional township fund, as to insure an equality of educational facilities throughout the State. The law implicitly complying with the directory provisions of the State Constitution as to the benefits to be conferred, if there be serious error, or an invasion of right in it, it remains to be demonstrated by some hypothesis not yet tangibly exposed to inspection.
 
 
 54
 The very law which, in good faith, and with no attempt at secrecy, takes into consideration the Congressional township fund, in providing a mode for the distribution of the school funds of the State, also takes from the county seats, throughout the State, their hitherto exclusive school fund, known as the seminary fund, and intermingles it with the funds from other sources, of which the educational fund of the State is composed. This consolidation is not complained of as an unwarranted assumption of power, nor is it pretended that it is not clearly within the legitimate scope of legislative authority. The same power that can rightly divert a revenue enjoyed by peculiar localities, and disburse it throughout an entire State, most certainly possesses a sufficient authority, over her own internal affairs, to take into consideration other funds, in her efforts at placing all upon a uniform basis as it respects the means of educating her people.
 
 
 55
 The idea of attaching to the Congressional township fund a degree of sacredness that renders its very contemplation by the State an unpardonable offence, is a creature of imagination, unsupported by any authority whatever. Indiana honorably acknowledges her trust, and provides strict rules for its most sacred observance. She feels the obligation resting upon her, and throws all needful restrictions, checks, and guards, around that fund, for its preservation and appropriation to the use for which it has been granted by the Federal Government, and intrusted to her as the trustee of her people. And at the same time, it is insisted, she justly appreciates her sovereignty in so distributing other funds as to advance, by her own contributions, such localities and recipients of her favors as have not the same educational facilities enjoyed by those who possess considerable Congressional township funds, in order that the educational advantages enjoyed by her people shall be equalized and uniform throughout her entire limits. And these powers, it is insisted, are rightfully exercised by her in the law in question, and it is conceived that the Supreme Court of the State did not err in sustaining the validity of the law.
 
 
 56
 Mr. Justice CATRON delivered the opinion of the court.
 
 
 57
 The twenty-fifth section of the judiciary act declares, that where is drawn in question the construction of any statute of the United States, and the decision is against the right set up or claimed by either party under the act of Congress, such decision may be re-examined, and reversed or affirmed, in the Supreme Court, on writ of error.
 
 
 58
 Here it is claimed, for the inhabitants of the township, that the fund arising from the proceeds of the sixteenth section shall not be estimated in distributing the general school fund of the State derived from taxes paid into the State treasury. The acts of the Legislature equalize the amount that shall be appropriated for the education of each scholar throughout the State, taking into the estimate the moneys derived from the proceeds of the sixteenth section, with the proviso, that the whole of the proceeds shall be expended in the township. If it be more, then an equal portion to each scholar elsewhere furnished by the State fund—still, the township has the benefit of such excess, but receives nothing from the treasury; and if it be less, then the deficiency is made up, so as to equalize according to the general provision.
 
 
 59
 And the question here is, whether the State laws violate the acts of Congress providing that the proceeds of the sixteenth section shall be for the use of schools in the township. And our opinion is, that expending the proceeds of the sixteenth section for the exclusive use of schools 'in the township' where the section exists, is a compliance with the legislation of Congress on the subject; nor is the State bound to provide any additional fund for a township receiving the bounty of Congress, no matter to what extent other parts of the State are supplied from the treasury.
 
 
 60
 The law is a perfectly just one; but if it were otherwise, and the school fund was distributed partially, nevertheless those receiving the bounty from Congress have no right to call on this court to interfere with the power exercised by the State Legislature in laying and collecting taxes, and in appropriating them for educational purposes, at its discretion.
 
 
 61
 We hold, that a true construction was given to the acts of Congress referred to, and order that the judgment be affirmed.