No. 83-281

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

IN THE MATTER OF THE ADJUDICATION
OF THE EXISTING RIGHTS TO THE USE
OF ALL THE WATER, BOTH SURFACE AND
UNDERGROUND, WITHIN THE POWDER RIVER
DRAINAGE AREA, INCLUDING ALL TRIBU-
TARIES OF THE POWDER RIVER IN CARTER,
CUSTER, FALLON, PRAIRIE, and POWDER
RIVER COUNTIES, MONTANA,

DEPARTMENT OF STATE LANDS,

Objector and Appellant,

        -vs-

WALTER PETTIBONE, DAVID and MELINDA
BLISS, ERNEST and PEGGY TOOKE,
GIACOMETTE RANCH, P.J. RANCH, ELMER
OEDEKOVEN, E. AMORY HUBBARD, CINCH
BUCKLE RANCH, MALLET CATTLE COMPANY,
ROBERT F. HARDY TRUST, ALVIN and HELEN
IRION, HARDY LAND & LIVESTOCK COMPANY,
and BALES RANCH,

Claimants and Respondents.

---

APPEAL FROM:   The Water Courts of the State of Montana,
               The Yellowstone Division-Powder River Basin,
               The Honorable W.W. Lessley, Chief Judge.

COUNSEL OF RECORD:

        For Appellant:

            Lyle Manley argued, Dept. of State Lands, Helena,
            Montana;  John F. North,  Dept. of State Lands

        For Respondents:

            John Carr argued for Bliss & Bales Ranch, Miles City,
            Montana

        For Amicus Curiae:

            Albert W. Stone, U of M Law School, Missoula, Montana
            Gough, Shanahan, Johnson & Waterman; Ronald F. Waterman
            argued for Montana Stockgrowers Assoc., Helena,
            Montana

---

                        Submitted:   February 21, 1985
                        Decided:     June 18, 1985

Filed:  JUN 1 1985

        _Ethel M. Harrison_
_____
                Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

The State of Montana appeals from the Powder River Final Decree holding title to certain water rights to be vested in respondents. We reverse.

The State of Montana, Department of State Lands, objected to the portion of the Powder River Preliminary Decree that awarded title of certain water rights to the above-named respondents, all lessees of State school trust lands. All of the factual disputes, as to flow, source and place of diversion and place of use were resolved prior to the hearing on the State objection held November 24, 1982. The hearing was confined solely to the following question of law:

> Does title to the water right vest in the
> lessee or the State of Montana as owner
> of the land where the water is diverted?

On April 4, 1983, The Water Courts Judgment--The Powder River Final Decree, was issued. It held that the title to the waters diverted on State school trust lands vests in the lessee, and not the State.

The State appealed this portion of the Final Decree. The appeal was first heard by this Court on January 13, 1984. Subsequently, by Order of March 26, 1984, we directed the parties to rebrief the case, and to address certain questions. Because of the broad significance of this case, we also solicited amicus curiae participation. The parties, and several amici, submitted supplemental briefs, and the matter was again heard on January 25, 1985.

There are twenty-three water rights involved in this appeal. They generally fall into one of the following categories:

> 1) Groundwater Wells: Four rights are
> from groundwater wells. Three of the

2

wells are on school trust lands, and used wholly thereon. One straddles the border between a state-owned and privately-owned section, and is used on both.

2) Developed Springs: Three rights are in developed springs for stock watering. The springs, and their uses, are confined to the school trust lands.

3) Diversions of Tributaries: Fifteen rights arise from diverting named or unnamed tributaries of larger creeks. In most, the appropriator has constructed a small dam on the tributary creating a small reservoir for stock watering. In some instances, water continues to flow from the reservoirs to the larger creek. One of the rights involves a draw of water from the Powder River devoted to irrigation, not stockwatering.

Thirteen of these diversions occur wholly on school trust lands with the use confined thereon. One right is in a reservoir on state land that serves both the state section and an adjacent private section. The last of these rights is an appropriation used for irrigation. In that case, the diversion is on state land, and the use is on both state and private land.

4) Direct Use: One right is in an undeveloped spring and its drainage adjacent to a creek in the Powder River drainage. The spring, and its use, is confined to the school trust land. This right has the oldest priority date of any at issue here, October 1, 1883.

According to the decrees associated with these rights, each is exercised year-round; although in times of drought, this may not be possible.

The lands upon which these water rights lie are those that were granted to the State of Montana by the Federal Government in the Montana Enabling Act. Act of February 22, 1889, ch. 180, 25 Stat. 676. Originally, these lands were set aside in the Montana Territory Organic Act, Act of May 26, 1864, ch. 95, 13 Stat. 85, which provided that said lands were "reserved for the purpose of being applied to schools" ch. 95, section 14, 13 Stat. 91 in the Montana Territory.

3

The Enabling Act granted these lands to the state on the following terms:

> "Section 10. That upon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed States, and where such sections, or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said States for the support of common schools.
>
> ". . .
>
> "Section 11. That all lands herein granted for educational purposes shall be disposed of only at public sale, and at a price not less than ten dollars per acre, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools. But said lands may, under such regulations as the legislatures shall prescribe, be leased . . . " ch. 180, 25 stat. 679.

The 1889 Montana Constitution accepted these lands and provided that they would be held in trust consonant with the terms of the Enabling Act, Montana Constitution of 1889, art. XVII, sec. 1. The 1972 Montana Constitution continued these terms, Mont. Const. art. X, sec. 11, ch. 1. See also section 77-1-202, MCA (school lands held in trust for the support of education).

The duty of administering the school trust lands is placed upon the Board of Land Commissioners (Board). Section 77-1-202(1), MCA provides that "The board shall administer this trust to secure the largest measure of legitimate and reasonable advantage to the State." Pursuant to 77-1-301(1), MCA, the Department of State Lands, (DSL) under the direction of the Board, " . . . has charge of the selecting, exchange, classification, appraisal, leasing, management, sale, or other disposition of state lands" The Department of State

4

Lands has also promulgated regulations governing the management, sale or lease of school trust lands. See generally Title 26, A.R.M.

Each of the respondents is a lessee of one or more sections of school trust lands. The DSL, by statute, sections 77-6-115 and 77-6-301 and -302, MCA, and by regulation §26-3.123, A.R.M., allows lessees to divert waters on the leasehold, develop them, and put them to use on or off that land. None of the rights at issue in this case were perfected pursuant to the above mentioned statutes or regulations. Rather, the lessees claim these rights as "use rights," which have long been recognized in this State, see Murray v. Tingley (1897), 20 Mont. 260, 50 P. 723, and Stone, Montana Water Law for the 1980's, p. 3, (1981 ed.)

These rights are at issue because of the general water rights adjudication underway in Montana. This process began with the passage of the Montana Water Use Act of 1973, ch. 452, L. 1973. The legislature enacted the Water Use Act in response to the chaos of previous Montana water law. See Stone, The Long Count on Dempsey: No Final Decision in Water Rights Adjudication, 31 Mont.L.Rev. 1 (1969); Stone, Are There Any Adjudicated Streams in Montana? 19 Mont.L.Rev. 19 (1957). It set up a system of general stream adjudication administered by the Department of Natural Resources and Conservation (DNRC) and also provided, from that time on, that the statutory method was the exclusive way to acquire a water right.

Prior to 1973, there were two possible ways of perfecting a water right. First was the method provided for by statute; posting at the point of diversion and filing a notice with the county clerk, Mont. Laws 1885, secs. 6 through 10; R.C.M. (1947), 89-810 through 814. Second was

5

simply by putting the water to use, Murray v. Tingley, supra.
The 1885 Act did not provide for any general adjudication of
streams. Nor did it provide any mechanism by which actual
uses, as opposed to claimed uses, could be ascertained. As
Professor Stone, in Montana Water Law for the 1980's states,
the problems the legislature addressed in 1973 were many:

> "It [the old water rights system under
> the 1885 Act] merely provided for
> isolated lawsuits between particular
> water users over their individual rights
> in isolated parts of streams. The
> statute resulted only in piecemeal
> litigation, often repetitive and among
> the same neighbors, over and over again
> disputing one another's claims.
> [Citations omitted.] It did not lead to
> security in one's property rights nor to
> finality in determining the fair and
> legal distribution of water among
> neighboring claimants.

> "But not only were the individual water
> users ill-served by this failure to
> establish water rights; the public
> interest also required an inventory of
> the state's water needs so that future
> negotiations or dealings with downstream
> states could allocate the waters of our
> interstate rivers." Stone, supra at p.
> 4.

The system of adjudication established by the 1973 Act
soon encountered difficulties. First, it required the DNRC
to physically inspect or discover all water rights. It soon
became evident that this process would take a very long time.
Six years after the 1973 Act was passed, the inspection and
adjudication of the Powder River Basin, one of the smallest
and relatively simplest in the State, was still in its
initial stages. Second, the 1973 Act did not provide for the
adjudication of federally reserved rights--presenting the
spectre of concurrent, wasteful and possibly inconsistent
litigation in the Federal Courts.

Responding to the shortcomings of the 1973 Act, the
1979 Montana Legislature enacted Senate Bill 76, ch. 697 L.
1979. It established a system of water courts and put upon

6

appropriators and users the burden of filing claims for their rights. It also provided for reserved water rights and set up a Compact Commission to negotiate the federal and Indian reserved rights. Ch. 697, sec. 27, L. 1979.

The Water Court system is charged with the final adjudication of water rights. Based upon the claims filed by users and appropriators, the court issues temporary preliminary decrees cataloging the various rights and priorities in the respective basin. All named or affected parties have, at that time, an opportunity to object to the temporary preliminary decree. If no objections are raised, the temporary decree is made final. Objections are heard and adjudged by the Water Court, with the right of appeal to this Court.

This is the first appeal we have been called on to hear from a final decree of the Water Court. In reviewing this, and subsequent final decrees, we will apply the same standards of review as any other appeal from a District Court order.

The question we consider is: Who is the owner of a water right diverted or developed on school trust land; the State or the lessee?

We hold that title to these water rights vests in the State. The lessee, in making appropriations on and for school trust sections, is acting on behalf of the State. It is only through state action that the lessee is on the land, and Montana law expressly provides that the lessee shall be reimbursed for all capital expenditures made in putting the water to beneficial use. The lessee, under the terms of the lease, is simply entitled to the use of water appurtenant to the school trust land. The State is the beneficial user of the water, and its duty as trustee of the school trust lands

7

prohibits it from alienating any interest in the land, such as the appurtenant water right, without receiving full compensation therefor.

The school trust lands are endowments by the United States to the State of Montana for the benefit of the common schools. A major policy of the fledgling nation was to foster public education by grants of land to newly admitted states for that purpose. Each of the thirty states carved out of the public domain received such grants, varying in the quantity granted, and terms of the grant, as national policy and political winds dictated. See generally Woodgerd and McCarthy, State School Trusts and Oil and Gas Royalty Rates, 3 Pub.Land L.Rev. 1 (1982).

Montana was admitted to the Union in 1889 along with Washington, North Dakota, and South Dakota. The Omnibus Enabling Act, supra, reflects the general policy of Congress as set out above. Even before Montana joined the Union, general principles, evolving from the judicial review of earlier enabling acts, governing the school land grant trusts were well settled. In two cases, the Trustees of Vincennes University v. State of Indiana (1852), 55 U.S. 268, 14 L.Ed. 267, and Springfield Township v. Quick (1859), 63 U.S. 56, 16 L.Ed. 256, the United States Supreme Court set out three important principles governing school trust lands: 1) that the enabling acts created trusts similar to a private charitable trust which the state could not abridge; 2) that the enabling acts were to be strictly construed according to fiduciary principles, and; 3) that the enabling acts preempt state laws or constitutions. See also Andrus v. Utah (1980), 446 U.S. 500, 520, 523, 100 S.Ct. 1803, 1814, 1815, 64 L.Ed.2d 458, 472, 474, where the United States Supreme Court reaffirmed those principles, holding that Congress imposed

8

upon the states a binding and perpetual obligation to use the granted lands for public education.

The courts have been very protective of the trust concept, and emphatic about the need to preserve the value of the trust corpus-the school lands. The seminal case in this regard is Lassen v. Arizona (1967), 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515. In Lassen, the United States Supreme Court held that the Arizona Highway Department was required to fully compensate the State Land Department (administrator of the school lands) for the value of easements taken across school lands. The Court held that the Arizona Enabling Act, ch. 310, 36 Stat. 557 (1910) "contain[ed] 'a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose'" Lassen at 467, 87 S.Ct. at 589, 17 L.Ed.2d at 522 (quoting Ervien v. United States (1928), 251 U.S. 41, 47, 40 S.Ct. 75, 76, 64 L.Ed. 128, 130).

In State of Utah v. Andrus (D. Utah 1979), 486 F.Supp. 995, the federal district court concluded that the lessees of state school lands had an implied right of access to their leasehold across adjacent federal lands. The court felt that if it held otherwise, "the very purpose of the school trust lands would fail. Without access the state could not develop the trust lands in any fashion and they would become economically worthless. This Congress did not intend." 486 F.Supp. at 1002. The Court in Utah v. Andrus made it clear that any restriction on the use (i.e. access) of school trust land that effectively devalues it cannot be sustained.

This Court has likewise been emphatic in protecting the school trust. In Rider v. Cooney (1933), 94 Mont. 295, 23 P.2d 261, we first held that a lease is an "interest" in land. Then, applying the rule that interests in school trust

9

lands cannot be alienated for less than full value, we held that the State musts also obtain full value for a lease thereof. See also State ex rel. Galen v. Dist. Ct. (1910), 42 Mont. 105, 112 P. 706; Gladden Farms, Inc. v. State (Az. 1981), 633 P.2d 325; Arizona State Land Department v. Superior Court (Az. 1981), 633 P.2d 330; City of Sierra Vista v. Babbitt (Az. 1981), 633 P.2d 333; State v. University of Alaska (Ak. 1981), 624 P.2d 807.

In Jerke v. State Dept. of Lands (1979), 182 Mont. 294, 597 P.2d 49, we addressed a situation analogous to the one at bar. The general question presented was how far the State could surrender its managerial prerogatives over school lands without violating the trust. Montana law empowers grazing districts to manage and allocate lands within their jurisdiction. This includes the power to grant preference rights to members in the re-leasing of school lands that are within the district. The plaintiff in Jerke contended that the preference right unconstitutionally prevented the State from receiving full fair market value for the land. Since the existing lessee who exercised the preference right was not using the land (and thus not "follow[ing] good agricultural practices and mak[ing] improvements on the land" 182 Mont. at 297, 597 P.2d at 51), we held the preference right was unconstitutional as applied. This was because:

> "To allow the preference right to be exercised in this case would be to install the Grazing District as the trustee of the land. It, rather than the Department of State Lands, would decide who will occupy the land but it would not be bound by a constitutional or fiduciary duty." 182 Mont. at 297, 597 P.2d at 51.

See also State ex rel. Thompson v. Babcock (1966), 147 Mont. 46, 409 P.2d 808 (upholding the Commissioner's discretionary authority to accept lease terms less than the highest bid in order to effectuate sustained yield concepts and insure the

long-term strength of the trust corpus); In Re Montana Trust and Legacy Fund (1964), 143 Mont. 218, 388 P.2d 366. The Oklahoma Supreme Court in Oklahoma Education Association v. Nigh (Ok. 1982), 642 P.2d 230 has also addressed the same question as this Court did in Jerke. The Oklahoma court went further and found several state statutes limiting the amount of interest that the state could receive on school lands, and creating preferences in the re-leasing of school lands, to be unconstitutional.

Most recently, the Washington Supreme Court upheld the federal land grant trust in holding the Washington Forest Products Industry Recovery Act of 1982, R.C.W. 79.01.1331-.1339, unconstitutional. The Act was passed in response to the decline of the prices in the forest products industry at the time. It allowed the Washington Department of State Lands to release contracts previously entered into with loggers and other forest products users because the industry stood to lose a great deal, due to the decline in prices, if the contracts were enforced. The Washington Supreme Court, in Skamania County v. Washington (Wa. 1984), 685 P.2d 576, dealt with the contracts on school trust land. Premising its argument by stating: "Every court that has considered this issue has concluded that these are real enforceable trusts that impose upon the state the same fiduciary duties applicable to private trustees," 685 P.2d at 580, the court found the act had violated the trust by transferring trust assets--the contract rights--for less than their full value and held it unconstitutional. 685 P.2d at 583. See also Torve and Handy, Skamania County v. Washington: A Case of Divided Loyalties, Fall 1984, Western Natural Resources Litigation Digest Commentary 7.

The above cases establish two main points that are important when considering either minor premise leading to our decision. First, an interest in school land cannot be alienated unless the trust receives adequate compensation for that interest. Water that is appurtenant to the school lands is an interest for which the trust must receive compensation. Second, any law or policy that infringes on the state's managerial prerogatives over the school lands cannot be tolerated if it reduces the value of the land. In this case, the DSL contends that to allow lessees to develop private, personal rights on school lands would impermissibly reduce the DSL's ability to manage these lands for their highest value.

Section 70-15-105, MCA states that:

> "A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way or watercourse or of a passage for light, air or heat from or across the land of another."

Further, Professor Wells A. Hutchins, in his treatise Water Rights Laws in the Nineteen Western States Vol. I at 455 (U.S. Dept. of Agriculture, 1971) states: "Of general application in the West is the rule that an appropriative right becomes appurtenant to the land for the benefit of which the water is applied."

In Montana, the determination of whether water is appurtenant to the land is one of fact. Yellowstone Valley Co. v. Associated Mortgage Investors, Inc. (1930), 88 Mont. 73, 290 P. 255; see also Hutchins, supra at 459. Here, by stipulated facts, it appears that all of the water rights at issue are used either in whole or in part on the school lands. Additionally, all of the lands in question are classified grazing lands under sections 77-1-401 to -404, MCA, and the water appropriated on them is used for

12

stockwatering or other agricultural purposes. The water rights in question are appurtenant.

This conclusion is consistent with the general rule that when title to irrigated property is passed, the water rights pass as an appurtenance unless specifically excepted. Section 85-2-403, MCA; Castillo v. Kunnemann (Mont. 1982), 642 P.2d 1019, 39 St.Rep. 460; Adams v. Chilcott (1979), 182 Mont. 511, 597 P.2d 1140; Schwend v. Jones (1973), 163 Mont. 41, 515 P.2d 89. Respondents point to no authority explaining why the rule in regard to leases of land should be different than with the sale of land. We believe it should be the same--the parties to any such transaction may specifically effect a severance, but absent such, the water right remains appurtenant, following title. It does not make sense for each succeeding tenant to walk off with one water right after another.

Respondents cite several cases that appear to articulate a contrary rule. The first, Smith v. Denniff (1900), 24 Mont. 20, 60 P. 398, is distinguishable in the fact that it concerned water appropriations made by squatters on the federal lands who diverted water for use on the public domain. The school trust lands were withdrawn from the public domain by the Montana Territory Organic Act, supra, in 1866, and none of the rights at issue in this case were developed before then. As discussed above, school trust lands are subject to a different set of rules than other public lands. Secondly they cite Hayes v. Buzzard (1904), 31 Mont. 74, 77 P. 423 for the rule that the question of whether water is appurtenant to the underlying land turns upon the intention of the appropriator. Again, Hayes arose on public domain land, not school trust land. This Court recognized that distinction:

13

"The legal title to the land upon which a water right acquired by appropriation made on the public domain [emphasis added] is used or intended to be used in no wise affects the appropriators title to the water right, for the bona fide [emphasis in original] intention which is required of an appropriator to apply the water to some useful purpose may comprehend a use upon lands and possessions other than those of the appropriator, or a use for purposes other than those for which the right was originally appropriated." 31 Mont. at 81 77 P.2d at 425, quoting Smith v. Deniff, supra.

(See also Ervien, 246 F. at 280: "Congress did not intend that the [school trust] lands granted and confirmed should collectively constitute a general resource or asset like ordinary public lands held broadly in trust for the people. . . ") Respondents' argument does not answer the state's concern with meeting its trust responsibilities.

Since an appurtenant water right is an interest in the land (see also section 70-1-106, MCA; Yellowstone Co. v. Asso. Mtg. Investors, supra) it cannot be surrendered by the State without the trust receiving fair market value. None of the lessees alleged payment of consideration to the State apart from that required by the lease, and thus we conclude that the water rights appurtenant to such lands belong to the State.

The State argues that vesting title in lessees would violate the trust for another reason. If a lessee lost his lease, but retained the water right, that lessee would in effect be able to control the use of the land. In many cases in this semi-arid area, the control of water means the control of the land itself. Conceivably, the DSL, in a desire to insure that the land had water, could find itself in the awkward position of negotiating with a former lessee, who might be inclined to release his right only to family or friends--thus assuring his re-entry. The former lessee could

14

"chill" the bidding process by letting it be known that he would only release his right at an inflated price. Finally, the former lessee could conceivably dictate possible uses of the land in return for the water. This situation is clearly repugnant to school trust principles. This Court, in Jerke v. State Department of Lands, supra, and other courts, see Oklahoma Education Assoc. v. Nigh, supra and State of Utah v. Andrus, supra, have consistently held that any infringement on the use or management prerogatives of the State that effectively devalue school lands is impermissible. We agree, and find this to be an alternative ground for our decision.

Respondents point to section 77-6-115, MCA, which states in pertinent part that:

> "(1) The lessee of state lands may at any time prior to 1 year before the expiration of his lease make application to the board for permission to secure a water right to the land under his lease. . . If the proposed plan meets with the approval of the board, permission shall be granted the lessee to secure the desired water right for the land and to place the same under irrigation.

> "(2) If such water right becomes a permanent and valuable improvement, then in case of the sale or lease of the lands to other parties, the former lessee shall be entitled to receive compensation in the amount of the reasonable value thereof, as in the case of other improvements, from the new lessee or the purchaser.

> "(3) These provisions shall not be so construed as to make the state liable to the lessee for the payment of the cost or value of such irrigation improvements."

They contend that this statute, in effect, acknowledges the property interest of the lessee in the water right, and further, that in subsection (3) the State denounces any interest in the water by releasing itself from liability for the cost of irrigation improvements. Respondents also point to §26.3.123, A.R.M., which provides that the State shall

15

reimburse departing lessees for the reasonable value of the improvements made (as per section 77-6-115(2), MCA), and that, "[a]ny water rights hereafter secured by the lessee shall be secured in the name of the state of Montana." They argue that since §26-3.123 A.R.M. was not adopted until 1979, it does not apply to the water rights in this case because all of them predate it. They also argue that the provision lends itself to supporting the position that the State had acquiesced in recognizing pre-1979 water rights in lessees. Both of these arguments are unfounded. First, none of the alleged rights at issue in this case were perfected pursuant to section 77-6-115, MCA or §26-3.123, A.R.M. Neither provision can be used as direct authority by respondents. For that reason we are not called upon to construe section 77-6-115, MCA. We note though that it is capable of two interpretations: first, as applying to water rights as respondents argue; secondly, as applying only to improvements, such as ditches, reservoirs, headgates, and other capital projects, constructed "for" or attached "to" the land and not subject to being retained by the lessee upon payment by a new lessee or purchaser, as is the case with other improvements to the leasehold, as contended by the State. The general rule is that whenever there are differing possible interpretations of statute, a constitutional interpretation is favored over one that is not. United States v. Clark (1980), 445 U.S. 23, 100 S.Ct. 895, 63 L.Ed.2d 171; Sutherland on Statutory Construction §45.11 (1984 ed.). In this regard, we point to the Skamania and Nigh, decisions holding statutes unconstitutional because they violated the school trust principles established by that state's Enabling Act.

16

In the alternative, respondents argue that section 77-6-115, MCA, and the principles of the Water Use Act set forth in section 85-2-101, MCA, and the prior appropriation doctrine, give rise to an implied severance of water from land in the school trust land leases, and that the State is now estopped to deny these rights because of the long-standing and detrimental reliance by the lessees.

As we discussed above, the State holds these lands subject to the school trust. The essence of a finding that property is held in trust, school, public, or otherwise, is that anyone who acquires interests in such property do so "subject to the trust" Nat. Audubon Society v. Superior Court (Cal. 1983), 658 P.2d 709, 723. See also Illinois Central Railroad v. Illinois (1892), 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (a state may not abdicate its trust in public property); and Thompson v. Babcock, supra at 54, 409 P.2d at 812, ("[w]hen state land is leased, it does not relinquish the entire interest therein"). The State has no power, absent adequate consideration, to grant the lessees the permission to develop non-appurtenant water rights, and every school trust lease carries with it this limitation.

Respondents' argument that they have detrimentally relied upon "representations" by the State made through its laws and regulations, is not persuasive. There has been no detriment. Section 77-6-302, MCA provides that lessors will receive reasonable compensation for any improvements they have made on the leasehold if they relinquish the property to a new lessee or purchaser. Further, the argument that this rule sets up disincentives to the development of our water resources, contrary to the general policy set out in the Water Use Act of promotiong the beneficial use of water, is also not persuasive. Section 77-6-302, MCA actually

insulates the developer-lessee from any market risk that he would have to bear if making improvements on his own land.

The Montana Constitution requires this result. Art. IX, sec. 3(1), provides that "all existing rights to the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed." This provision prevents the State from affecting rights vested at the time the Constitution was adopted other than through the exercise of Constitutionally provided powers such as eminent domain, Mont. Const. Art. II, sec. 29, or the general police power, and without affording due process of law, Mont. Const. Art. II, sec. 17. Here the State, through the adjudication process, is claiming, and this Court is recognizing rights "existing" at the time the 1972 Constitution was adopted-- Art. IX, sec. 3(1) merely reaffirms these rights.

As stated above, we hold that the lessee, under the terms of the school trust lease, is entitled to the use of water appurtenant to the leased land. The State is the beneficial user thereof, and its duty as trustee of the school lands prohibits it from alienating this interest in the land absent full compensation therefor. Absent such compensation, the title to the water rights in this case vest in the State.

Appellants and amici have urged this Court to find that school trust lands benefit from a federally reserved water right as originally recognized in Winters v. United States (1907), 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340, to which the State has succeeded. In our opinion, it is perhaps best to keep the reserved rights doctrine confined to situations where it arose and is most appropriate; as an accommodation between federal and state interests. Since the rule we have stated is sufficient to settle the case at bar, principles of judicial restraint counsel us to decline ruling further.

18

This rule applies to all the waters at issue. Subject to Title 85, Chapter 2, Part 5, MCA, groundwater appropriated and used on State land should be treated no differently than surface waters appropriated and used on those lands. The Montana Constitution, Art. IX, sec. 3, Mont. Const. and the Water Use Act, section 85-2-102(14), MCA, make no distinction between groundwater and other water rights.

The Order of the Water Court is reversed, and the case remanded for the purpose of modifying the Powder River Final Decree in compliance with this Opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
John C. Sheehy

_____
William E. Hunt
Justices

19

Mr. Justice Frank B. Morrison, Jr. specially concurring:

The majority opinion recalls to mind the old Montanan who said, "A moose is a cow designed by a committee." Indeed, this moose must have been designed by a committee.

The only bright light which shines through this otherwise verbose and rambling epistle is the result. In that I concur.

The majority opinion contains a good deal of judicial chaff including a rather lengthy recital of irrelevant historical data surrounding passage of the Montana Water Use Act of 1973. This effort effectively obfuscates the issues while impressing the casual reader that scholarship is the cornerstone of the majority's pronouncement.

The issue in this case is quite simple and straight forward. At the time the federal government granted school lands to the state in trust for educational purposes, did the federal government include within the grant the right to develop water to achieve the educational purposes of the trust? If, as an incident of ownership, the state acquired, as appurtenant to the land, the right to develop water so that the purpose of the trust could be realized, then the state cannot alienate that property right in diminution of the trust res.

The majority opinion initially indicates that the educational purpose of the trust cannot be realized without an appurtenant water right. With this I agree. However, in an apparent attempt to avoid interrupting the priorities of other appropriators, the majority seems to be saying that this appurtenant right did not spring into existence until it was developed by the lessee. This approach recognizes the priority of appropriators. In order to accomplish this objective the majority has created a fictional agency whereby

20

the lessee, who develops the water, does so on behalf of the state.  This nonsense is engaged to achieve a result.

The majority's effort to secure unto school lands a sufficient amount of water to maximize their income potential for the trust, without disrupting prior rights, could have been achieved on a more legally sound foundation by simply holding that the federal government granted to the state school lands with the appurtenant right to develop water in order to maximize their income producing ability.  The court then could have held that, under the prior appropriation doctrine, a priority date did not commence until the right was developed.  In this way, at least, the majority would have recognized the property right in the state from the beginning which would give a basis for holding that the lessee developed the right for the state.

In truth, these school lands were withdrawn from the public domain prior to any appropriation.  The federal government granted to the state, in trust for educational purposes, land and the water necessary to develop the land for its trust purposes.  Later, when the public domain was settled appropriations were made but the appropriations only operated on those lands remaining in the public domain.  Settlers who moved in and appropriated could have obtained no water from  school lands which resided safely in the trust.

I find it unfortunate that reference is made to the "Winters Doctrine" or to federal reserved rights.  Apparently there is some anticipation by the majority that this precedent will effect the adjudication of Indian water rights.  Perhaps by analogy it will.  However, those cases are not before us.

I concur in the result for the reason that, at the time of the creation of the school trust, the federal government

21

conveyed to the state, not only the land, but the appurtenant right to develop water necessary for fulfillment of the trust purpose. I specifically disavow the remainder of the majority's opinion.

Justice