WHEAT ET AL., RESPONDENTS, *v.* CAMERON ET AL., APPELLANTS.

(No. 4,877.)

(Submitted September 28, 1922.   Decided November 4, 1922.)

[210 Pac. 761.]

*Water Rights—Appropriation—How Made—Amount Acquired—How Gauged—Findings—Evidence—Sufficiency.*

Water Rights—Intent to Appropriate Water—How Determined.
1.   Intent to appropriate water for irrigation purposes must be determined from the acts of the appropriator, its actual and contemplated use and the purpose thereof.

Same—What Constitutes an Appropriation of Water.
2.   Actual diversion of water and its beneficial use existing, prospective or in contemplation constitute an appropriation, which is not affected by a change in the point of diversion or place of use.

Same—Amount of Appropriation—How Gauged.
3.   The amount of an appropriation of water is gauged by the amount taken in at the head of the ditch, rather than by the amount actually delivered at the place of beneficial use, since the appropriator must make allowance for evaporation and seepage.

Same—Amount of Water Acquired by Appropriation.
4.   An appropriator cannot acquire a right to more water than his ditch will carry.

Same—Claimant Owning Other Rights—Effect on Right in Issue.
5.   The mere fact that the evidence in a water right suit discloses that plaintiff also claims a right out of a watercourse other than the one at issue does not authorize the court to require him to exhaust his right out of the first before asserting his right to a claim out of the second, since such action would amount to an adjudication of rights of junior appropriators on such latter stream not parties to the action.

2.   What constitutes appropriation of water, see note in 60 Am. St. Rep. 799.

[64 Mont. 494.]

Same—Findings—Evidence—Burden of Showing Insufficiency on Appellant.

6. In a water right suit (one in equity) in which appellant asserts that the findings of the court are not supported by the evidence, he has the burden of showing that the evidence preponderates against them.

*Appeal from District Court, Madison County; Wm. A. Clark, Judge.*

ACTION by G. G. Wheat, special administrator of the estate of the H. B. Elling, deceased, and another against J. B. Cameron and others. Judgment for plaintiffs and defendants appeal. Affirmed.

*Messrs. Pray & Callaway* and *Mr. H. P. Beckett,* for Appellants, submitted a brief; *Mr. Lew L. Callaway* argued the cause orally.

The facts in this case in many respects are so nearly like those in *Toohey* v. *Campbell,* 24 Mont. 13, 60 Pac. 396, as to make the principles of law there announced directly applicable here.

In the appropriation of water, however, made, the element of intent has been requisite from the earliest date. (*Woolman* v. *Garringer,* 1 Mont. 535.)

The mere passive acceptance of water as it flowed into the Page-Varney ditch at the point of its intersection with Mill Creek did not constitute a valid appropriation of such waters thereby intercepted. (*Smith Canal etc. Co.* v. *Colorado Ice etc. Co.,* 34 Colo. 485, 3 L. R. A. (n. s.) 1148, 82 Pac. 940.)

The plaintiffs' predecessors were not entitled to the water flowing into the Bear Creek ditch from Mill Creek unless they had need therefor and actually applied it to be a beneficial use. (*Toohey* v. *Campbell, supra; Quigley* v. *Birdseye,* 11 Mont. 439, 28 Pac. 741; *Creek* v. *Bozeman Water Works Co.,* 15 Mont. 121, 38 Pac. 459; *Anderson* v. *Cook,* 25 Mont. 330, 64 Pac. 873, 65 Pac. 113; *Hilger* v. *Sieben,*

38 Mont. 93, 98 Pac. 881.) In an oft-cited opinion by Judge Hawley in *Union Mill & Mining Co.* v. *Dangberg*, 81 Fed. 73, it is said: "In the appropriation of water there cannot be any 'dog in the manger' business by either party to interfere with the rights of others, when no beneficial use of the water is or can be made by the party causing such interference."

*Mr. M. M. Duncan*, for Respondents, submitted a brief and argued the cause orally.

The evidence in the present case shows that the Bear-Mill Creek ditch was dug, not only for the purpose of carrying Bear Creek water, but also Mill Creek water; that all of the water flowing in the creek was diverted and actually used for beneficial purposes. Intent to appropriate water follows diversion and use for a beneficial purpose. In other words, intent to appropriate is presumed from such diversion and use, just as a criminal intent is presumed from a criminal act. Were this not the rule it would be impossible in many instances where *bona fide* water rights exist to prove a valid appropriation of water, as it is often out of the question to have the original appropriator as a witness. In such a case, we know the appropriation is proved by diversion and use, the intent, from these acts, being conclusively presumed. Actual diversion and use constitutes appropriation. (*Windsor Res. & Canal Co.* v. *Lake Superior Ditch Co.*, 44 Colo. 214, 98 Pac. 729; *Maynard* v. *Watkins*, 55 Mont. 54, 173 Pac. 551.) The authorities cited by appellants on the question of "intent" are not applicable to the case at bar.

It is no objection to a finding that 'the date fixed was arbitrarily selected so long as the priority is not affected. (*McDonald* v. *Lannen*, 19 Mont. 78, 74 Pac. 648.)

It is not the rule that the highest aggregate number of acres irrigated by a claimant to water in any one year is the basis upon which to figure his appropriation. (*Weldon Val-*

*ley Ditch Co.* v. *Farmers' Pawnee Canal Co.,* 51 Colo. 545, 119 Pac. 1056.) "The measure of one's appropriation is not regulated by the average amount which the stream will carry, but by the greatest amount, reference being had to the appropriator's needs, and his facilities for conducting it to the place where it is to be used." (*Sayre* v. *Johnson,* 33 Mont. 15, 81 Pac. 389.).

At the time Varney irrigated this land in section 1 it was unsurveyed public domain. Later it passed to the railroad, and by mesne conveyances from the railroad to these respondents as shown by the records in evidence. It is uniformly held that a trespasser upon land may acquire the exclusive right to use the water, either to irrigate land or for other purposes. (*Patterson* v. *Ryan,* 37 Utah, 410, 108 Pac. 1118; *Williams* v. *Harter,* 121 Cal. 47, 53 Pac. 405; *Judkins* v. *Elliott,* 2 Cal. Unrep. 697, 12 Pac. 116; *Ramelli* v. *Irish,* 96 Cal. 214, 31 Pac. 41; *Geddis* v. *Parrish,* 1 Wash. St. 587, 21 Pac. 314; *Isaacs* v. *Barber,* 10 Wash. 124, 45 Am. St. Rep. 772, 30 L. R. A. 665, 38 Pac. 871; 2 Kinney on Irrigation 2d ed., p. 1324.) However, in this case Varney was not a trespasser. He was in possession of all of the land, including that in section 1, as a squatter. It was, while he held it, a portion of the unsurveyed public domain, and this court has held that a squatter is not regarded as a trespasser.

The appellants argue the proposition that as no evidence was offered by respondents showing ownership of the "foothill ditch," no water right could be acquired by its use by them. Ownership of the means of conveying water to land is not an element of a water right. (2 Kinney on Irrigation, 2d ed., p. 1457 and notes; *Utt* v. *Frey,* 106 Cal. 392, 39 Pac. 807.)

MR. JUSTICE GALEN delivered the opinion of the court.

This action involves an adjudication of water rights in Mill Creek, Madison county. Upon issue joined the case was

tried to the court without a jury. Findings of fact and conclusions of law were made in favor of the plaintiffs, and judgment entered in their favor accordingly. A bill of exceptions embracing all of the testimony taken at the trial was settled and allowed, which is incorporated in the record. The appeal is from the judgment.

So far as pertinent to the questions arising on this appeal, the court found that the predecessors in interest of the plaintiffs, Varney and Page, in the year 1866 squatted upon 160 acres each of unsurveyed lands, and by means of a ditch which they dug and constructed from Bear Creek "intercepted and tapped and appropriated" fifty inches of the waters of Mill Creek; that between the head of what is now known as the Storey-Cameron ditch, being the ditch of the defendants, and the "foothill" or "Mill Creek ditch," hereinafter called the Mill Creek ditch, and the point where the original Bear Creek ditch crosses Mill Creek, a distance of three miles, the character of the soil is such that between the head of the Mill Creek ditch and the point where it empties into the old Bear Creek ditch it loses from forty-five to eighty per cent depending upon the quantity of water running in the stream; and that in order to supply fifty inches to the lands of the plaintiffs it is necessary that there should be deposited in the Mill Creek ditch 120 inches of water; that some time between May 1, 1867, and May 1, 1872, a ditch was constructed out of Mill Creek known as the Mill Creek ditch, which had a capacity of 600 inches, but "no water had been established as flowing in it prior to 1875," but that since 1875 the predecessors in interest of the plaintiffs used the ditch and the waters of Mill Creek appropriated thereby for irrigation, and used it for the purpose of conveying the waters appropriated in 1867, and the existence of it was known by the defendants and their predecessors in interest when they made their appropriation in 1881; that the predecessors in interest of the plaintiffs on May 1, 1875,

[64 Mont. 494.]

appropriated and diverted 350 inches of water through this ditch.

The court further found that on the first day of May, 1881, the defendants and their predecessors in interest appropriated 200 inches of the waters of Mill Creek, and conveyed the same through the Storey-Cameron ditch, and on May 1, 1893, through the same ditch, they appropriated 400 statutory inches, and entered decree accordingly.

The only question involved is the sufficiency of the evidence to justify the court's findings and conclusions as to the adjudication by it made in plaintiffs' favor of water rights from Mill Creek, 120 inches as of date May 1, 1867, and 350 inches as of date May 1, 1875.

At the outset of the trial it was stipulated that the lands for which water rights are claimed by the respective parties are arid in character, and require water for the production of crops. The defendants contend there is no evidence showing or tending to prove an appropriation of the waters of Mill Creek in the year 1867, made by Page and Varney, the first predecessors in interest of the plaintiffs, and that the evidence does not warrant a finding that any of the waters of Mill Creek were appropriated by anyone prior to 1881. It is further contended by the defendants, as to this right, that the predecessors in interest of the plaintiffs, the McDonnells, did not need over one-half of the waters of Mill Creek, and did not use more than that amount.

The appropriation found as of date May 1, 1867, is based solely upon the testimony of James M. Page. It appears therefrom that he had lived in Madison county since June, 1866, and that he settled on the Bear Creek bench in 1866, on the "Sodom ranch," where in the fall of 1866 he built a cabin and broke eighty acres of land, which he seeded to wheat, oats, and vegetables in the spring of 1867. He testified that for the purpose of irrigating the land he constructed a ditch from Bear Creek, which crossed Mill Creek, and at the

point where it crossed Mill Creek he "prepared the bank so in case there was any water" his ditch would "take it up"; that there was no settlement at that time on Mill Creek, and that he was then in partnership in the ranching business with O. B. Varney, their arrangement being that Varney should look after the livestock and the witness should attend to farming, so that he alone constructed this ditch. He worked on the ditch in April and May which was "four and one-half or five miles" long, and it was completed about the middle of May, "in good time for irrigating." That season (1867) he used the waters from Bear Creek and such as came into the ditch from Mill Creek, and irrigated most of the land once. The copartnership with Varney was dissolved, and the latter took the ranch. They had merely a "squatter's right" to the land at that time, eighty acres thereof being fenced, and the witness remained there but one year. The ditch was about three and one-half feet wide on the bottom and one and one-half feet to two feet deep, and carried about 250 inches of water. After describing his methods of irrigating, he says that he had plenty of water for irrigating that year, and that no one else was then using water from either Bear Creek or Mill Creek.

Does this evidence establish the appropriation of a water right from Mill Creek May 1, 1867, by Page and Varney, predecessors in interest of the plaintiffs, as found by the court, and, if so, is the award made of 120 inches as of that date warranted? That the appropriation was in fact made clearly appears from the testimony of the witness Page. He says in substance: "I am unable to say how much water I picked up in my Bear Creek ditch from Mill Creek at the point where my ditch crossed Mill Creek"—and on this point testified: "Q. Did you make your ditch where it crossed this creek now known as Mill Creek so that it would take the waters of Mill Creek? A. Yes, sir. I brought the ditch across the channel without any reference to the water, ex-

cept I prepared the bank, made it stronger, on the lower side, so in case there was any water my ditch would take it up. Q. Was it used by you? A. If any come I used it.  *  *  * I can only say that I constructed my ditch so that in the event of water coming down occasionally—a storm or excessive warm weather bringing it down from the mountains—the water would come down so I could pick it up; but as to the amount I used from Mill Creek I am unable to say. *  *  * From Mill Creek down my ditch would carry whatever water came into Mill Creek; it was big enough for that. While we were irrigating we used- it all.''

It is argued by defendants' learned counsel that no intent to make an appropriation from Mill Creek on the part of Page and Varney is shown, and therefore the adjudication is not warranted. We think this evidence clearly discloses that Page and Varney dug the ditch from Bear Creek across Mill Creek, not only to take water to their lands for irrigation from Bear Creek, but from Mill Creek as well. Intent [1] to appropriate will be presumed from these facts, showing, as they do, diversion and use of Mill Creek waters for irrigating purposes. A claimant's intent at the time of appropriation must be determined by his act and by surrounding circumstances, its actual and contemplated use, and the purpose thereof. (*Toohey* v. *Campbell*, 24 Mont. 13, 60 Pac. [2] 396.) Actual diversion and beneficial use existing or in contemplation constitute an appropriation (15 R. C. L. 456, 460; *Windsor Res. & Can. Co.* v. *Lake Supply Ditch Co.*, 44 Colo. 214, 98 Pac. 729; *Maynard* v. *Watkins*, 55 Mont. 54, 173 Pac. 551), and from this evidence it is plain that water from Mill Creek was in fact appropriated in the spring of 1867 by Page and Varney, predecessors of plaintiffs, as found by the court. And the change in the point of diversion or place of use did not affect the appropriation. (Sec. 7095, Rev. Codes 1921; *Hays* v. *Buzard*, 31 Mont. 74, [3] 77 Pac. 423.) The amount of an appropriation is

gauged by the amount of water taken in at the head of the ditch, rather than by the amount actually delivered at the place of beneficial use. The appropriator must make allowance for evaporation and seepage, and, whatever his needs at the place of use, he is limited in his appropriation to the amount of water his ditch will actually deliver, to be gauged at the head of the ditch. (*Caruthers* v. *Pemberton*, 1 Mont. 111; *Smith* v. *Duff*, 39 Mont. 382, 133 Am. St. Rep. 587, 102 Pac. 984; *Bailey* v. *Tintinger*, 45 Mont. 154, 122 Pac. 575.) An appropriator cannot acquire a right to more [4] water than his ditch will carry, and it is manifest it cannot carry a greater amount than that permitted by the headgate capacity.

It appears from the record that rights to the waters of Bear Creek have been adjudicated, and with regard thereto, as affecting the actual amount appropriated and necessary to be used from Mill Creek, it was stipulated: "We have agreed that the court, in order to determine the amount of water, if it becomes necessary, that was received on the Elling-Hodgens ranch from Indian Creek and Bear Creek, and also on the Cameron and Storey ranches, that the court may interview Mr. Glass, the water commissioner, who diverted the waters and distributed them to these people, as to the amount that was actually turned in during the years he was there as commissioner, a year or so ago, and use his record to determine how much water these ranches received from these sources. We have agreed that the court can take these records and consider them as evidence. That was for 1915 and 1916."

The mere fact that the evidence discloses rights claimed by [5] plaintiffs for irrigation out of Bear Creek as well as Mill Creek does not require plaintiffs to first exhaust their rights in Bear Creek, as that would amount to an adjudication of rights of junior appropriators in Bear Creek not parties to this action. (*Norman* v. *Corbley*, 32 Mont. 195, 75 Pac. 1059.)

[64 Mont. 494.]

This case must be decided alone upon the record before us. We may not consider or determine the amount of water properly to be adjudicated from Bear Creek. We are considering Mill Creek rights only. It is to be presumed from the stipulation above set out that the court made its findings with respect to the rights of the parties, giving due consideration to the amount of water available from Bear Creek.

While Page and Varney had but about eighty acres inclosed and cultivated in 1867, the evidence shows a loss by seepage and otherwise of from forty to sixty per cent between the point where the Bear Creek ditch intersects Mill Creek and the plaintiffs' lands. The court found that the predecessors in interest of the plaintiffs had appropriated fifty inches of Mill Creek May 1, 1867, and decreed to them 120 inches to make up for seepage and evaporation. The award was in our opinion justified by the evidence.

Counsel for defendants argue that the findings made, awarding to plaintiffs 350 inches of water as of date May 1, 1875, are wholly unwarranted. We have carefully reviewed, considered, and weighed all of the evidence, and cannot agree with this contention. True it is that there is uncertainty as to the actual date of the construction and use of the "foothill" or Mill Creek ditch tapping the waters of Mill Creek for irrigation purposes, but the great preponderance of the testimony establishes its existence, use, and capacity prior to May 1, 1881, being the earliest date of an award to the defendants. The defendants cannot gain advantage, unless the date of plaintiffs' appropriation is found to be subsequent to the rights established by them, and this is not justified from the evidence.

In the case of earlier appropriations, the court must arbitrarily name some date in order to fix the priority (*McDonald* v. *Lannen*, 19 Mont. 78, 74 Pac. 648) and, in our opinion, the court did not err in the date found. The evidence would justify the fixing of even an earlier date. The prin-

cipal factors entering into the court's findings of this right are: (1) Date of appropriation; (2) capacity of Mill Creek prior to May 1, 1881; (3) amount of land under ditch possessed by Varney; (4) amount of land irrigated by Varney prior to 1881; (5) diligence used by the predecessors in interest of plaintiffs and of the plaintiffs in bringing under cultivation and irrigation the land under this ditch; (6) loss by seepage, or otherwise, in the Mill Creek or "foothill ditch" from intake of ditch to the land.

As to the date and amount of the appropriation, J. B. Jeffers says he has resided in the Madison Valley, and has been acquainted with "the old 'Sodom ranch' and Mill Creek" since 1872; saw ditches there from Mill Creek in '73, and knew they raised crops, but did not see water in the ditches.

Ethel A. Maynard says she knew the Varney or "Sodom" place in 1867, and of it being irrigated and cultivated from that time on into the early '70's. She remembers a ditch from Mill Creek to this land in " '73 or '74, or perhaps '75''; she rode across it many times, but does not remember there being water in it, and supposed it ran to the Varney place, because there was no other ranch within many miles thereof.

John H. Spray says he was first on the Varney ranch in 1874 or 1875, the witness then being but eight years old. He says he remembers being on the Mill Creek ditch in 1875, and went to the head of the ditch in either '74 or '75 with Jimmy McDeed, who was then working on the ranch for Mr. Varney. He estimated the capacity of Mill Creek at about 1,000 inches, and says that he was on the Mill Creek ditch "from them years plumb into the '80's until John McDonnell bought the place." He says there was lots of water there "in time of high water, and then it got low in low water," on the Varney place, and from 80 to 100 acres were irrigated. He says he worked for Mr. Varney in 1876 and 1877, herding horses, and that Mr. Varney always had a crop in and got

water out of Mill, Tolman, and Bear Creeks, the waters being run and used together. No one else was taking water out of Mill Creek in the '70's and there was no other irrigation being done in the locality up to the time McDonnell bought the place in 1881. Further, that the Mill Creek ditch would carry 200 or 300 inches of water.

John Graham says he farmed on the old "Sodom" ranch in 1878. He went there about the middle of June, 1878, and helped irrigate. They had in crops, about 100 acres, and used all the water in Mill and Tolman Creeks. The Mill Creek water was mixed with the Bear Creek water in the Bear Creek ditch. There was no other ditch out of Mill Creek, and no one else up there. The land was farmed in · '79, although the witness had nothing to do with it. Varney had it, and broke up about twenty-five acres additional of sod land. During the second irrigating in '78, there was very little water in either Mill or Tolman Creek; the water was low and sank into the ground.

Witness Terence McDonnell testified that he and his brother John took over the "Sodom" place in 1883; that there were then 200 acres under fence, actually irrigated; and that the Mill Creek ditch would carry 500 or 600 inches of water.

Witness John McDonnell testified that in 1883 the ditch would carry 450 or 500 inches of water, and that there were over 200 acres actually under fence and irrigated.

A deed was offered and received in evidence, dated March 5, 1883, from Osman B. Varney to John F. McDonnell, conveying "the house, stable, and fence (being from 600 to 800 rods of fence) and other improvements upon the northeast quarter of section 12, in township 7 south of range 1 west, M. P. M., and also that certain water ditch and water right which carries the waters of Mill Creek, and the branch of said ditch which carries the waters of Tolman Creek, to and upon the above tract of land; which water ditch and water· right I, the party of the first part, have used upon the said tract of land for the purpose of irrigation for a period of

twelve years last past." The contents of this deed, together with the oral testimony, clearly shows that Mr. Varney had not only possession of 160 acres of land in section 12, but also land in section 1 which was cultivated, for some years previous to the making of this deed. This land, it appears from the map offered in evidence by plaintiffs, and the testimony of Surveyor Carl C. Adams, is under this "foothill ditch," and so located as to be irrigated therefrom.

The evidence given by Mr. Page shows that on the Sodom ranch there were cultivated at least eighty acres of land in 1867, which was then partly irrigated with the waters of Mill Creek through the Bear-Mill Creek ditch, and the testimony of witness Spray shows that in '74 and '75 there were 80 or 100 acres irrigated from Mill Creek on this place, and Mr. Graham's testimony shows that in 1878 there were 100 acres irrigated, and that in 1879 this was increased some twenty-five acres. The evidence of Mr. Fowler shows that from the time he knew the place in 1877 to the time of the trial it was continually farmed and irrigated from Mill Creek. He testified that when he first knew the "Sodom" ranch in 1877 Varney was farming it, and had in crops between forty and fifty acres, and threshed 2,300 bushels. "There was three places that he got his water from; that is Mill Creek, Tolman Creek, and Bear Creek; there was ditches from all three creeks. * * * Q. Do you know where the ditch comes out of Mill Creek, up next to the foothills? A. I do. Q. How long have you known that ditch? A. I have known it since I have been in the country. Q. It was there in '77, was it? A. It was. * * * Q. Has that place been farmed at all times since you first knew it in '77? A. Yes, sir."

The evidence, as set forth above, and as appears from the record, clearly shows that Page and Varney had in their possession and under the Mill Creek ditch between 1867 and 1883 at least 320 acres of land; that at least eighty acres

of this were put under cultivation and irrigated as early as
1867, and that during the '70's this area of cultivated and
irrigated land gradually increased until there were at least
125 acres in 1879, and upward of 200 acres cultivated and
irrigated in 1883. From 1883 on down to the time of the
trial of this action the area cultivated and irrigated was
gradually increased, until at the time of the survey made by
witness Adams there were a total of 598.7 acres irrigated,
principally from Mill Creek, all of which is shown by the
map in evidence. According to witness Terence McDonnell,
between 1883 and 1889 the 160 acres of this land filed on
by him, being the northeast quarter of section 12, was in-
creased in cultivated area from 80 to 140 acres, and the wit-
ness John McDonnell, who owned all of this land in 1905,
testified that during the time he owned the place, between
1883 and 1905, the irrigated area on this north half of section
12, and in section 1, was increased so that all but seventy-
five acres in the north half of section 12 were under irriga-
tion in 1905, and seventy-five acres were under irrigation in
section 1, which would make an increase in the land irri-
gated of 120 acres during this time, there being 200 acres
under irrigation when he and his brother bought out Var-
ney, and the evidence shows, as indicated above, that this area
was increased between 1905 and the time of the trial to ap-
proximately 600 acres.

The testimony shows the diligence required, under the law,
in putting this land under cultivation and irrigation, in order
to entitle the plaintiffs to sufficient water from Mill Creek
with which to irrigate all of these lands as of dates prior to
any right of the defendants.

Loss by seepage becomes important when the amount of
land belonging to plaintiffs, irrigated with the waters of Mill
Creek, is considered, with the amount of water awarded plain-
tiffs. The court, having found that the loss by seepage or
otherwise in the "foothill ditch" or Mill Creek ditch, from

its intake to the land varied from forty to sixty per cent, made a further award to the plaintiffs of 350 inches as of 1875 at the intake of this ditch. This allowance was justified by the testimony. Assuming the loss in this ditch to be fifty per cent of the amount diverted into it between its intake and plaintiffs' lands, they would only actually receive for irrigation 175 inches of water as of date 1875, and sixty inches as of 1867, or a total of 235 inches as of dates prior to the rights of the defendants.

The use to which water is to be applied need not be immediate, but may be prospective and contemplated, so long as there is a *bona fide* intention to make a beneficial use of the water. (*McDonald* v. *Lannen, supra; Arnold* v. *Passavant,* 19 Mont. 575, 49 Pac. 400; *Bailey* v. *Tintinger, supra.*)

The briefs of counsel in this case have been of great assistance to this court in formulating this opinion, both as respects the law and record facts, and we express our appreciation therefor.

The burden rests on the defendants to show that the evidence preponderates against the court's findings, and [6] having failed so to do, the judgment is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES COOPER and HOLLOWAY concur.