FILED

04/30/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0314

DA 23-0314

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 88

DEBRA V. SCHUTTER and SIDNEY J. SCHUTTER,

 Claimants and Appellants,

STATE OF MONTANA BOARD OF LAND COMMISSIONERS,

 Objector and Appellee.

APPEAL FROM: Montana Water Court, Case No. 41H-0243-R-2021
      Honorable Stephen R. Brown, Water Judge

COUNSEL OF RECORD:

 For Appellants:

  Colleen A. Coyle, Coyle Law Firm, PLLC, Bozeman, Montana

  KD Feeback, Toole & Feeback PLLC, Lincoln, Montana

 For Appellee:

  Brian C. Bramblett, Montana Department of Natural Resources and Conservation, Helena, Montana

  Rachel Meredith, Office of the Governor, Helena, Montana

 For Amicus State of Montana:

  Austin Knudsen, Montana Attorney General, Michael J. Noonan, Assistant Attorney General, Helena, Montana

  Emily Jones, Special Assistant Attorney General, Jones Law Firm, PLLC, Billings, Montana

 For Amicus Rocky Mountain Stockgrowers Association, and Greenfields Irrigation District:

  Jon Metropoulos, Metropoulos Law Firm, Helena, Montana

Submitted on Briefs: January 17, 2024

Decided: April 30, 2024

Filed:

_____
                          Clerk

2

Justice Beth Baker delivered the Opinion of the Court.

¶1 Appellants Debra Schutter and Sidney Schutter (the Schutters) appeal the Montana Water Court's grant of summary judgment to the State of Montana Board of Land Commissioners (the Board) on the Board's objection to the decree of ownership of water right 41H-13169-00 (Claim 13169). At issue is whether the State of Montana holds an ownership interest in a water right developed and diverted on private land for beneficial use on State-owned school trust land. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Claim 13169 is for rights to groundwater used by the Schutters on land located in the NWSESE of Township 1 North, Range 3 East, Gallatin County. The Schutters use a groundwater well located on their private property to irrigate four parcels of land where they grow potatoes and other crops. The general abstract of Claim 13169 describes the four places of use (POU) as:

| ID | Acres | Govt Lot | Qtr Sec | Sec | Twp | Rge | County |
|----|-------|----------|---------|-----|-----|-----|--------|
| 1 | 160.00 | | SE | 28 | 1N | 3E | GALLATIN |
| 2 | 160.00 | | SW | 28 | 1N | 3E | GALLATIN |
| 3 | 160.00 | | NW | 33 | 1N | 3E | GALLATIN |
| 4 | 50.00 | | NE | 33 | 1N | 3E | GALLATIN |

POU Nos. 1, 3, and 4 are private land owned by the Schutters. POU No. 2 is school trust land belonging to the State of Montana. Claim 13169 has a priority date of August 10, 1960.

¶3 In 1960, John Schutter, the Schutters' predecessor in interest, drilled the well the Schutters now use to exercise Claim 13169. From that well, John appropriated water necessary to irrigate the four parcels—the three he owned and POU No. 2, which he leased

from the State—from April 15 to October 25 each year. Consistent with the historical use of the claim, the Schutters pull water from the well sufficient to irrigate 530 acres of cropland. A portion of the total appropriation is diverted and piped across the Schutters' property to POU No. 2.

¶4 In 2019, the Board filed an objection to Claim 13169, asserting an ownership right in the water used to irrigate POU No. 2. On the Board's motion, the Water Court granted summary judgment and added the State as co-owner of Claim 13169, limited to that portion of the claim appropriated to irrigate POU No. 2.

¶5 The parties agree to the relevant facts of this dispute. The land that now constitutes POU No. 2 was reserved to the State in 1864, accepted in the General Land Office survey on November 18, 1868, and granted to Montana in 1889. The Board claims no ownership in POU Nos. 1, 3, or 4, or in any portion of Claim 13169 appropriated therefor. The Board further claims no ownership in the well that is located on the Schutters' private property. The Schutters similarly claim no ownership right in POU No. 2 but claim exclusive ownership of the entirety of Claim 13169.

¶6 Additional pertinent facts are discussed below.

## STANDARDS OF REVIEW

¶7 Summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3). We review a district court's grant of a motion for summary judgment de novo.

4

*Advoc. for Sch. Tr. Lands v. State*, 2022 MT 46, ¶ 5, 408 Mont. 39, 505 P.3d 825. We review decisions from the Montana Water Court under the same standards of review we apply to the district courts. *Marks v. 71 Ranch, LP*, 2014 MT 250, ¶ 13, 376 Mont. 340, 334 P.3d 373.

## DISCUSSION

¶8      The utilization of the land of the American West to benefit public education is a policy nearly as old as the United States of America. In 1785 the Continental Congress undertook a program to survey and dispose of the lands of the Western Territory. *See* An Ordinance for Ascertaining the Mode of Disposing of Lands in the Western Territory, Journals of the Continental Congress, v. 29, p. 923, (hereinafter Western Ordinance) (https://lccn.loc.gov/90898224). The plan called for the division of western land into six-by-six mile "townships." In turn, each township was subdivided into thirty-six one-square-mile sections. The townships and sections were to be sold to the public at auction. Although most of the land was earmarked for public sale, the Continental Congress "reserved the lot No. 16 of every township, for the maintenance of public schools within the said township." *See* Western Ordinance.

¶9      Nearly one hundred years later, under a new Congress and a new Constitution, the policy of reserving certain land assets for the purpose of funding public education was extended west to what would become the Territory of Montana. *See* An Act to Provide a Temporary Government for the Territory of Montana, ch. 95, § 14, 13 Stat. 85, 91 (1864) (hereinafter Organic Act). Under the Organic Act, both section sixteen and section

thirty-six of each township were set aside for the future benefit of the public schools of Montana. Organic Act, § 14. In 1889, Montana was admitted to the Union. The lands reserved by the Organic Act were granted to the State for sale or lease—the proceeds to be used to establish a permanent school fund. Omnibus Enabling Act of 1889, ch. 180, §§ 10, 11, 25 Stat. 676, 679-80 (hereinafter Enabling Act).[1] Montana accepted the land grants, required they "be held in trust for the people," determined that all proceeds derived from them would be held in the Montana school fund, and declared that the fund "shall forever remain inviolate, guaranteed by the State against loss or diversion." Mont. Const. of 1889, art. XVII § 1, XI, §§ 2, 3. The 1972 Montana Constitution adopted much of the same language, including the provision holding the fund inviolate against loss or diversion. *See* Mont. Const. art. X, §§ 2, 3, 11.[2]

---

[1] In addition to the lands granted in support of the common schools, the Enabling Act granted Montana lands for various schools, colleges, and public buildings. Those lands are not at issue in this case.

[2] Evincing Montana's strong policy of funding public education through utilization of public lands, the 1889 and 1972 Constitutions do not limit the school trust to those lands granted in the Enabling Act. For instance, article X, § 2 of the 1972 Constitution includes the following provision:

> The public school fund of the state shall consist of:
> (1) Proceeds from the school lands which have been or may hereafter be granted by the United States,
> (2) Lands granted in lieu thereof,
> (3) Lands given or granted by any person or corporation under any law or grant of the United States,
> (4) All other grants of land or money made from the United States for general educational purposes or without special purpose,
> (5) All interests in estates that escheat to the state,
> (6) All unclaimed shares and dividends of any corporation incorporated in the state,
> (7) All other grants, gifts, devises or bequests made to the state for general educational purposes.

¶10 The lands granted by the Enabling Act constitute a trust governed by the terms the Act sets forth. *Montanans for the Responsible Use of the School Trust v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶ 13, 296 Mont. 402, 989 P.2d 800 (citing *Rider v. Cooney*, 94 Mont. 295, 306-07, 23 P.2d 261, 263 (1933)). As trustee, the Board[3] "is bound, upon principles that are elementary . . . to secure the largest measure of legitimate advantage" to the trust beneficiaries. *State v. Stewart*, 48 Mont. 347, 349-50, 137 P. 854, 855 (1913). One of the Board's duties as trustee is to ensure that "none of [the trust lands], nor any estate or interest therein, shall ever be disposed of . . . unless the full market value of the estate or interest disposed of . . . has been paid or safely secured to the State." Enabling Act, § 11 (as amended by the Act of May 7, 1932, ch. 172, 47 Stat. 150, (1932)).

¶11 The above referenced statutes and constitutional provisions speak primarily to land grants. We recognized in *In re Powder River Drainage Area*, 216 Mont. 361, 702 P.2d 948 (1985) (*Pettibone*) that land and water rights, however, are inextricably intertwined. In *Pettibone* this Court unanimously determined that the State "is the owner of a water right diverted or developed on school trust land." 216 Mont. at 368, 702 P.2d at 952. In its order granting summary judgment for the Board, the Water Court relied primarily on and discussed extensively the *Pettibone* decision.

¶12 A portion of the Powder River preliminary decree awarded a collection of water rights to a group of individuals and ranching operations (collectively Pettibone) for

---

[3] Both the 1889 and 1972 Constitutions designate the Board as the body with the power to "direct, control, lease, exchange, and sell school lands." Mont. Const. art. X, § 4. The Board consists of the governor, superintendent of public instruction, auditor, secretary of state, and attorney general. Mont. Const. art. X, § 4; *see also* Mont. Const of 1889, art. XI, § 4.

irrigation and stockwatering on both school trust and privately owned land. *Pettibone*, 216 Mont. at 364-65, 702 P.2d at 950. The Montana Department of State Lands objected to the preliminary decree. *Pettibone*, 216 Mont. at 364, 702 P.2d at 950. At issue were twenty-three water rights claims, a combination of groundwater wells, developed springs, diverted tributaries, and direct uses. *Pettibone*, 216 Mont. at 365, 702 P.2d at 950. Of the twenty-three rights, twenty-two were developed with a diversion point on school trust land. *Pettibone*, 216 Mont. at 365, 702 P.2d at 950. The twenty-third right was a groundwater well with a diversion point that "straddle[d] the border between a state-owned and privately[]owned section and [was] used on both." *Pettibone*, 216 Mont. at 364, 702 P.2d at 950. The school trust lands at issue were granted to Montana by the Enabling Act for the purpose of being applied to the schools and accepted under the 1889 Montana Constitution "[to] be held in trust consonant with the terms of the Enabling Act." *Pettibone*, 216 Mont. at 365-66, 702 P.2d at 950-51 (internal quotations omitted).

¶13 The legal question in *Pettibone* was whether the State or the private lessees were the rightful holder of the water rights used on school trust land. After careful consideration of the history and purpose of school trust lands, Montana's processes for water rights adjudication, and the applicable federal and state laws, we determined that two important points controlled the answer: first, an interest in water appurtenant to school trust land cannot be alienated by the State absent adequate compensation, and second, any law or policy that would infringe upon the State's managerial prerogatives over school trust lands is invalid if it reduces the value of the land. *Pettibone*, 216 Mont. at 371, 702 P.2d at 954.

8

Applying these points to the situation in *Pettibone*—water diverted from sources on school trust land and used on school trust and privately held lands—we concluded that the water rights developed for use on the school trust land were appurtenant thereto and that granting the right to the private parties would be "repugnant to school trust principles." *Pettibone*, 216 Mont. at 373, 702 P.2d at 955. We held further that a non-appurtenant water right can never be granted to a lessee of any school land lease, unless adequate consideration is given. *Pettibone*, 216 Mont. at 375, 702 P.2d at 957.

¶14 In its order, the Water Court reasoned that "*Pettibone* is grounded on the notion that where a water right is appurtenant to State school trust land, water right ownership only can be severed from the State land when the State receives separate compensation for the water right." The Water Court held that "[a] water right appurtenant to school trust land, even in part, triggers State ownership under *Pettibone*" irrespective of "whether the [lessee] own[s] the point of diversion and part of the place of use."

¶15 The Schutters argue that the Water Court erred in granting summary judgment for the Board for two reasons. First, the Schutters assert that *Pettibone* is inapplicable to their case and the Water Court was wrong to apply it. Second, the Schutters claim that no portion of Claim 13169 is appurtenant to POU No. 2 and, therefore, no portion of their private water is part of the school trust corpus.[4] Both of the Schutters' arguments hinge on their assertion that, because Claim 13169's point of diversion rests entirely on private property,

---

[4] In the alternative, the Schutters argue that if Claim 13169 is owned partially by the Board, the Schutters are entitled to fair compensation under Mont. Const. art. II, § 29. Because we hold that the portion of Claim 13169 used to irrigate POU No. 2 vested in the State upon its creation, we need not address this argument.

9

*Pettibone* is inapposite and the rights at issue never became appurtenant to POU No. 2. The Board, therefore, does not have the authority to assert any ownership over their "private water."

¶16 In response, the Board argues that Claim 13169 is a use right appurtenant to POU No. 2 and therefore is part of the school trust. *Pettibone*, it argues, is not limited to situations where a water source is both diverted and used on school trust lands but encompasses diversions on private land as well. Granting Claim 13169 to the Schutters would unconstitutionally divest the school trust of property without fully compensating it for the fair market value of the right, the Board asserts.

¶17 As a foundational observation, none of the waters within the geographic boundaries of Montana are "private water." Whether underground, surface, flood, or atmospheric, all waters in Montana are "the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law." Mont. Const. art. IX, § 3(3).[5] Holders of water rights in Montana possess a use right, allowing them to beneficially use an appropriated amount of Montana's water. *See Montana Water Law* at 4. Today, the establishment of a use right is controlled by the Montana Water Use Act. *See Generally* Title 85, MCA. Prior to July 1, 1973, however, a use right most commonly was established by "actual appropriation and diversion, perfected by application of the water so appropriated to a beneficial use then present or contemplated." *Toohey v. Campbell*, 24

---

[5] Notable exceptions to this general rule exist, including tribal waters, federal waters, and water rights reserved through inter-sovereign compacts. *See* Stephen R. Brown, Michelle L. Bryan, & Russ McElyea, *Montana Water Law* 237 (2021) (hereinafter *Montana Water Law*). The rights at issue in this case do not fall into any of those categories.

Mont. 13, 17, 60 P. 396, 397 (1900). Under this rule, known as the prior appropriation doctrine, the first to appropriate water from the public domain for a beneficial use held a priority right over all other claims. *In re Jefferson River Drainage Area*, 2005 Mont. Water LEXIS 9, *12 (July 19, 2005). In 1972, Montana affirmed all water rights established under the prior appropriation doctrine. Mont. Const. art IX, § 3(1) ("[a]ll existing rights to the use of any waters for any useful or beneficial purpose are hereby recognized and confirmed.").

¶18     Under the prior appropriation doctrine, the existence and contours of a water right primarily are controlled by the intent of the appropriator, determined by the facts and circumstances surrounding an appropriation. *In re Missouri River Drainage Area*, 2002 MT 216, ¶ 23, 311 Mont. 327, 55 P.3d 396 (citing *Wheat v. Cameron*, 64 Mont. 494, 210 P. 761 (1922)). Two geographical points are crucial to determining the existence and scope of a claimed water right—the point of diversion and the place of use. The point where an appropriator diverts a water source for a beneficial purpose has long been recognized as central to "providing notice of a user's intent to appropriate water, and defining the extent of the use." *In re Missouri River Drainage Area*, ¶ 22 (citation omitted). Often, a diversion is sufficient to support a claimed water right. *See Wheat*, 64 Mont. at 501-02, 210 P. at 763. Although an important factor, the point of diversion alone does not control the ownership or scope of a water right. *See In re Missouri River Drainage Area,* ¶ 40 (holding that an historic (pre-1973) use right could be found where the beneficial use does not require a water source to be diverted if other facts and circumstances evince the

11

appropriator's intent); *Nelson v. Brooks*, 2014 MT 120, ¶ 48, 357 Mont. 86, 329 P.3d 558 (stating that ownership of the land where a well is located does not prevent a third party from acquiring a water right therein).

¶19     The importance of the place of use stems from the requirement that appropriated water be put to beneficial use. When water is appropriated for beneficial use on a particular tract of land, it is appurtenant to that land. Section 70-15-105, MCA; *Maclay v. Missoula Irrigation Dist.*, 90 Mont. 344, 353, 3 P.2d 286, 290 (1931) (citing *Lensing v. Day & Hansen Co.*, 67 Mont. 382, 215 P. 999 (1923)); *see also Leggat v. Carrol*, 30 Mont. 384, 387, 76 P. 805, 807 (1904) ("[t]his court has held for many years, by a uniform line of decisions, that a water right is appurtenant to that land upon which it is used"). The general rule does not always apply in instances in which a valid appropriator has made beneficial use of her right on the land of a third party. *Smith v. Denniff*, 24 Mont. 20, 28-29, 60 P. 398, 401 (1900). In *Smith*, we determined that a water right and an easement right could become appurtenant to land only where the same person holds unified title of the land and the right. 24 Mont. at 29, 60 P. at 401; *see also In re Jefferson River Drainage Area*, 2005 Mont. Water LEXIS 1, *12 (Aug. 3, 2005) (hereinafter *Huckaba*) ("[g]enerally, a water right does not become an appurtenance to land titled in another unless, (1) the appropriator obtains title to the land; (2) the water right is conveyed to the owner of the land, or (3) the facts and circumstances indicate that the appropriator intended to make the right appurtenant to the land.").

¶20 The heart of *Pettibone* is our determination that the general rule outlined in *Smith* does not apply where a water right is intended to be used on school trust land. *Pettibone*, 216 Mont. at 368, 702 P.2d at 952. The magnitude of the State's trust responsibilities, as set out in the Enabling Act and Montana's Constitution, require any water right that is appurtenant to school trust land be retained by the State or sold for fair market value. *Pettibone*, 216 Mont. at 368-69, 702 P.2d at 952. A lessee who appropriates water for beneficial use on school trust lands "is acting on behalf of the State," which is the "beneficial user of the water, and its duty as trustee of the school trust lands prohibits it from alienating any interest on the land . . . without receiving full compensation therefor." *Pettibone*, 216 Mont. at 368, 702 P.2d at 952. Simply put, where a water right becomes appurtenant to school trust land, it becomes a part of the trust corpus and must "forever remain inviolate, guaranteed by the state against loss or diversion." Mont. Const. art. X, § 3.

¶21 Whether a water right is appurtenant to land is a question of fact. *Yellowstone Valley Co. v. Associated Mortgage Investors*, 88 Mont. 73, 84, 290 P. 255, 258 (1930). The agreed upon facts here show conclusively that the portion of Claim 13169 used to irrigate POU No. 2 is appurtenant to school trust land. POU No. 2 was reserved as school trust land as early as the General Land Office Survey of 1868. POU No. 2 subsequently was granted to Montana by the Enabling Act. As the Schutters' counsel stated before the Water Court, in 1960, when John Schutter dug the well that is the point of diversion of Claim 13169, he did so "for the purpose of irrigation, not only for his property, but also for [his lease on

13

POU No. 2] that [he] owned at the time." From its inception, the portion of Claim 13169 used to irrigate POU No. 2 was intended to be, and in practice was, beneficially used only on school trust land. As noted above, the point of diversion of an appropriation is an important factor in determining the intent of the appropriator. *In re Missouri River Drainage Area,* ¶ 22. The Schutters' reliance on the point of diversion as singularly controlling, however, is misplaced and overstates its importance. To support a valid claim, an appropriation of water must be put to beneficial use—it is the "basis, the measure and the limit of all rights to the use of water." *McDonald v. State*, 220 Mont. 519, 530, 722 P.2d 598, 605 (1986) (citation omitted).

¶22 The Schutters argue that the more expansive test for appurtenance described in *Pettibone* does not apply and that appurtenance should be tested based on the three avenues described in *Huckaba*. The Schutters, as they did in the Water Court, fail to recognize the statement in *Huckaba* that *Pettibone* created a "clear exception to these general rules of ownership and appurtenancy [sic] in Montana." *Huckaba*, *12. Even under the more general rules, however, the Schutters' argument would fail. The facts and circumstances indicate that John Schutter intended to appropriate water for beneficial use on school trust land, making it appurtenant under § 70-15-105, MCA.[6] As the four separate POUs demonstrate, John Shutter's clear intent in appropriating water was, in part, to beneficially use his appropriation on school trust land. The validity of Claim 13169, therefore, relies not only on the Schutters' private land, but on that portion of water used on POU No. 2.

---

[6] *See also* § 67-211, RCM (1947).

14

Accordingly, that portion of Claim 13169 intended for use on POU No. 2 is appurtenant to school trust land. The Board's "duty as trustee of the school trust lands prohibits it from alienating this interest in the land absent full compensation." *Pettibone*, 216 Mont. at 376, 702 P.2d at 957.

¶23 In their attempt to distinguish *Pettibone*, the Schutters also point to the Montana Water Court's decision in *In re Shields River Basin*, 2000 Mont. Water LEXIS 1 (June 29, 2000) (*Kunnemann*).[7] In *Kunnemann*, the DNRC objected to Claim 43A-W-042435-00, claiming proportional ownership of the right used to irrigate a parcel of school trust land under this Court's decision in *Pettibone*. *Kunnemann*, *19.

¶24 In 1893, Alexander and John McNiven, consonant with the applicable laws at the time, established a water right to divert 600 inches of water from a point on the Shields River "near the north line of Section 4, in Township 1 South, Range 10 East, Park County . . . for beneficial use on the North 1/2 of Section 9, Township 1 South, Range 10 East, Park County." *Kunnemann*, *4 (internal quotations omitted). In 1911, the Sixth Judicial District Court, Park County, decreed that John McNiven was the sole owner over a right encompassing 450 inches of water appropriated from his private land for beneficial use on several sections then owned by John McNiven, with a priority date of August 14, 1893. The court also decreed the right appurtenant to John McNiven's land. *Kunnemann*,

---

[7] Although the Kunnemanns were not a named party in *In re Shields River Basin*, the parties to this case and the Attorney General as amicus have adopted the Kunnemann name when referring to the decision. As is discussed below, *Kunnemann* also was considered in the 2019 Montana Legislature's adoption of HB 286—which refers to the case as "Case No. 43A-A." For clarity we will adopt the nomenclature used by the parties and refer to the decision as *Kunnemann*.

*4-5. Over the next several decades, John McNiven's land and the appurtenant water rights were transferred and divided several times. *See Kunnemann*, *4-11. At multiple periods, but not before 1907, John McNiven and his predecessors in interest used portions of the water right to irrigate portions of Section 16, Township 1 South, Range 10 East, Park County—school trust land. *See Kunnemann*, *5-11. The State argued that the use of the water to irrigate school trust land brought the claim within the ambit of *Pettibone* and made a portion of the claim property of the school trust. The Water Court disagreed and determined that *Pettibone* did not apply because the portion of the claim objected to by the DNRC was a "positive, certain, and vested property right before it was ever used on school trust land." *Kunnemann*, *25.

¶25    The *Kunnemann* decision was not appealed, and this Court has not had the opportunity to consider its reasoning. Regardless, a key factual distinction makes *Kunnemann* inapplicable to this case. The water rights at issue in *Kunnemann* were "a positive, certain, and vested property right, which was subsequently decreed in [John McNiven's] name and appurtenant to his private land" long before any portion of the right was utilized on school trust land. *Kunnemann*, *16 (citation omitted).

¶26    Although the *Kunnemann* decision includes a lengthy discussion of the point of diversion, the Schutters again overstate the importance of that fact. *Kunnemann*, *36-38. *Kunnemann* represents a situation in which an appropriator with a fully vested water right would, from time to time, use excess water from that right to also irrigate a parcel of school trust land. *Kunnemann*, *17. In contrast, Claim 13169 was developed with the intent to

16

be used in specific part on school trust land and consistently has been so used since the first appropriation. The Schutters argue that the Board is capturing their water right, but that is an incomplete and therefore inaccurate assessment of the case. The Schutters claim a right to use water to irrigate 530 acres of farmland—160 acres of which is school trust land. The Schutters used the school trust land they leased to qualify for and establish the parameters of Claim 13169. Without the ability to claim a beneficial use on the school trust land, the Schutters' claim to a water right would have been different, perhaps smaller. The Board seeks only to be listed as an owner of the portion of the water right that the Schutters utilize on state land—the very land the Schutters utilized to qualify for their water right in the first place. Unlike the claim in *Kunnemann*, Claim 13169 became appurtenant to school trust land at its inception.

¶27 The fact that a portion of Claim 13169 is appurtenant to school trust land dictates a finding that the State is a co-owner of the right. *Pettibone*, 216 Mont. at 373, 702 P.2d at 955. As we noted in *Pettibone*, however, additional policy considerations require the same outcome. *Pettibone*, 216 Mont. at 373, 702 P.2d at 955-56. The Board's duty as trustee requires that it seek to secure the largest measure of legitimate advantage to the beneficiary. *See Stewart*, 48 Mont. at 349-50, 137 P. at 855. With respect to land leases, this duty is fulfilled through the competitive bidding process by which individuals may secure a lease. Granting an individual lessee a water right appurtenant to school trust land risks also granting that lessee a monopsony over the land and outsized control over the bidding process. We addressed this concern directly in *Pettibone* when we wrote:

17

[i]f a lessee lost his lease, but retained the water right, that lessee would in effect be able to control the use of the land. In many cases in this semi-arid area, the control of water means the control of the land itself. . . . [The Board] in a desire to insure that the land had water, could find itself in the awkward position of negotiating with a former lessee, who might be inclined to release his right only to family or friends -- thus assuring his re-entry. The former lessee could "chill" the bidding process by letting it be known that he would only release his right at an inflated price. Finally, the former lessee could conceivably dictate possible uses of the land in return for the water. This situation is clearly repugnant to school trust principles.

216 Mont. at 373, 702 P.2d at 955.

¶28 The same principle holds true under the circumstances of the Schutters' claim. For the above stated reasons, we hold that the State is the rightful owner of that portion of Claim 13169 used to irrigate the 160 acres of POU No. 2.

¶29 We reiterate that the Board does not claim, the Water Court did not grant, and we do not hold that the Board has any ownership interest in the well or in the means of transporting water to POU No. 2. *See McDonnell v. Huffine*, 44 Mont. 411, 423, 120 P. 792, 795 (1912) ("the water right is entirely distinct from the right to the ditch, canal or other structure in which the water is conveyed." (quoting 1 Wiel on Water Rights in the Western States, section 280)). As the Board concedes, its only interest in this case is to that portion of the water used to irrigate POU No. 2.[8]

¶30 There remains one final point to consider. During the pendency of this appeal, the Montana Attorney General moved to intervene on behalf of the State. The Attorney

---

[8] During oral argument before the Water Court on the Board's motion for summary judgment, counsel for the Board disclaimed any ownership in the point of diversion stating, "if the [Schutters] no longer had the lease . . . the [Board] would just have to submit a change application for a point of diversion to be on [school trust land]."

18

General argued that intervention was necessary to ensure that the duly enacted laws of Montana were followed. The Board objected to intervention. Because the Attorney General's motion to intervene was significantly untimely and because the interests of the State were adequately represented by the Board, of which the Attorney General is a member, we denied the motion. In lieu of intervention, we allowed the Attorney General to file a brief as *amicus curiae*. *See* Order Denying Motion to Intervene at 2, No. 23-0314 (Sep. 19, 2023).

¶31 In briefing, the Attorney General points the Court's attention to § 85-2-441, MCA.[9] That law reads as follows:

> Temporary use of a water right on state trust land -- restrictions on state ownership -- rescinding of noncompliant ownership interests required.
>
> (1) A water right owner may put water from a well or developed spring with ground water development works located on private land to beneficial use on state trust land for the duration of a state land lease the water right owner holds.
>
> (2) The state may not obtain an ownership interest in a water right or the ground water development works of a water right that is diverted from a well or developed spring located on private land exclusively based on trustee obligations for state trust land unless:
>
> (a) a court of competent jurisdiction determines that the state is an owner of that particular water right; or
>
> (b) the state is in possession of a deed transferring ownership of the water right to the state.
>
> (3) Before September 30, 2019, the state shall rescind any claim of ownership it asserted or acquired to satisfy trustee obligations for state trust land prior

---

[9] The Attorney General also argues that *Kunnemann* applies and that the Board's actions constitute a taking under the constitutions of the United States and of Montana. These arguments were both raised by the Schutters and are addressed above. We need not address them further.

19

> to May 11, 2019, in a water right or ground water development works that do not meet the requirements of subsection (2).
> (4) For the purposes of this section, "state trust land" has the meaning provided in 77-1-101.

The Attorney General argues that § 85-2-441, MCA is controlling and that the Water Court erred in not considering the law when it granted summary judgment for the Board.

¶32 The Schutters did not raise § 85-2-441, MCA in their opening brief, nor did they raise the issue in front of the Water Court. We generally do not allow amicus to raise separate issues not raised by the parties. *Dep't of Health and Envtl. Scis. v. Lasorte*, 182 Mont. 267, 275-76, 596 P.2d 477, 482 (1979). This rule, however, is not inflexible, and in the rare instance in which amicus raises a separate issue of important weight, we will address it. *See Reichert v. State*, 2012 MT 111, ¶¶ 24-27, 365 Mont. 92, 278 P.3d 455.

¶33 Section § 85-2-441, MCA, began as HB 286 in the Montana House of Representatives. 2019 Mont. Laws ch. 432. The bill was in large part a response to the DNRC Trust Lands Management Division's practice of asserting ownership rights in post-1973 claims for water used on school trust lands by filing Ownership Update Forms with the DNRC Water Rights Bureau, which afforded landowners no opportunity to object.[10] *See Advoc. for Sch. Tr. Lands*, ¶¶ 2-4. The precatory language of the bill reads in part as follows:

---

[10] Authority over policy regarding school trust lands rests with the Board. In 1973, the Board delegated to the Department of State Lands, "all of the functions vested in the Board under the laws of Montana, except those functions expressly reserved by the Board." *See* Minutes: Alternate Meeting of the State Board of Land Commissioners, Meeting Minutes, Agenda Item 273-6 (Feb. 20, 1973). This delegation was transferred to the DNRC in 1996 and is still in force today. *See* Minutes: Regular Meeting of the Board of Land Commissioners, Agenda Item 896-5 (Aug. 19, 1996). DNRC carries out these responsibilities through its Trust Lands Management Division.

WHEREAS, the use of water derived from a well or developed spring whose diversion works is not located on state-owned land to provide stock water on state-owned land is in the best interest of the state land lessee and the state; and

WHEREAS the ability to manage livestock grazing and improve grazing management through the use of stock tanks generates revenue to the state through increased revenue from grazing leases; and

WHEREAS, the state of Montana asserting ownership over privately held water rights derived from a well or developed spring whose diversion works are located wholly on private land serves as a disincentive to improving grazing management on state-owned lands through the use of water tanks; and

WHEREAS, the Montana Water Court in Case No. 43A-A found that the temporary use of a privately owned water right on state land did not equate to state ownership of all or a part of the water right; and

WHEREAS, a water right that is diverted and developed on private land is not subject to the holding in Department of State Lands v. Pettibone; and

WHEREAS, the state of Montana incorrectly expanded the scope of Department of State Lands v. Pettibone to include all trusts, not just school trust lands; and

WHEREAS, the state of Montana incorrectly expanded the scope of Department of State Lands v. Pettibone to assert ownership over water rights that were diverted and developed on private land; . . .

2019 Mont. Laws ch. 432.

¶34 The Attorney General's argument that § 85-2-441, MCA, controls is misplaced. The broad language in the bill and the precatory provisions in HB 286 notwithstanding, § 85-2-441, MCA, does not explicitly address historic water rights claims. The bill was codified in Title 85, Ch. 2, Part 4, MCA, governing post-July 1, 1973 claims. Within that part, § 85-2-401(3), MCA, makes clear that "[p]riority of appropriation perfected before

21

July 1, 1973, must be determined as provided in part 2 of [Title 85, Ch. 2, MCA]." Given the late injection of this issue into the case, we decline to opine on the extent of § 85-2-441, MCA's applicability but conclude that the statute does not affect the Schutters' pre-1973 claim.

**CONCLUSION**

¶35 The portion of Claim 13169 used to irrigate POU No. 2 is appurtenant to school trust land and the State does not have the power to transfer it without first securing the full fair market value of it. As such, the Water Court was correct to add the State as an owner of the water right for the portion used on school trust land. Its judgment is therefore affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

22